FILED

FEB - 4 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___RS___ DEPUTY

FULL NAME
Ronald Gene Robinson
COMMITTED NAME (if different)
Ronald Eugene Robinson
FULL ADDRESS INCLUDING NAME OF INSTITUTION
CMC EAST PO BOX 8101, C6211
San Luis Obispo, CA 93409-8101
PRISON NUMBER (if applicable)
C47067

Received  2/3/22
                    (Date)
Scanned at CMC and E-mailed
on  2/3/22  by  ✓
     (Date)              (Initials)
Number of pages scanned:
~~288~~ 144

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

RONALD GENE ROBINSON

PLAINTIFF,

v.

EXCEL SHARRIEFF, JOHN DENVIR, S. SILVA,
M. FERNANDEZ, D. TOMELLOSO, D. DANIEL,
S. CHISHOLM, D. SAMUEL
DEFENDANT(S).

CASE NUMBER **2:22-CV-00806-CAS-ADS**

*To be supplied by the Clerk*

**CIVIL RIGHTS COMPLAINT**
**PURSUANT TO** *(Check one)*
☒ 42 U.S.C. § 1983
☐ Bivens v. Six Unknown Agents 403 U.S. 388 (1971)

## A. PREVIOUS LAWSUITS

1. Have you brought any other lawsuits in a federal court while a prisoner: ☒ Yes  ☐ No

2. If your answer to "1." is yes, how many? **Three (3).**

   Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on an attached piece of paper using the same outline.)

Lawsuits #1 and #2 were both filed 1997 through 1998 (or about): #1 involved a series of racial attacks upon me by other prisoners that I believe prison officials knew were likely to happen, but failed to prevent. Lawsuit #2 involved a liberty interest claim that I made while confined to the Security Housing Unit at Corcoran Prison.

Suite #1 was filed against the Warden of Calipatria Prison. #2 Was filed against the Warden of Corcoran Prison. Both were dismissed: I do not have the records of those suits and do not remember the specific reasons for those dismissals. Nor do I know the case number or judges involved in those failed cases.

Lawsuit #3 is currently in progress: information of #3 provided on page 2 of this form.

---

a.  Parties to this previous lawsuit:
Plaintiff _Ronald Gene Robinson._

Defendants _General Manager of CALPIA, et alia._

b.  Court _United States District Court for the Central District of California._

c.  Docket or case number _CV20-11591-CAS(ADS)._

d.  Name of judge to whom case was assigned _District Judge Christina A. Snyder._

e.  Disposition (For example: Was the case dismissed? If so, what was the basis for dismissal? Was it appealed? Is it still pending?) _Disposition pending._

f.  Issues raised _First and Fourteenth Amendment Constitutional violations._

g.  Approximate date of filing lawsuit: _December 23, 2020, and amended on May 14, 2021._

h.  Approximate date of disposition _Pending._

## B. EXHAUSTION OF ADMINISTRATIVE REMEDIES

1.  Is there a grievance procedure available at the institution where the events relating to your current complaint occurred? ☒ Yes   ☐ No

2.  Have you filed a grievance concerning the facts relating to your current complaint? ☒ Yes   ☐ No

    If your answer is no, explain why not _____

3.  Is the grievance procedure completed? ☒ Yes   ☐ No
    **Including Government Claims on assigned claim number 20011040.**
    If your answer is no, explain why not _____

4.  Please attach copies of papers related to the grievance procedure. **Papers attached.**

## C. JURISDICTION 42 U.S.C. § 1983 with The Court having supplemental jurisdiction over Plaintiff's State Law tort claims under 28 U.S.C. § 1367.

This complaint alleges that the civil rights of plaintiff _Ronald Gene Robinson_
(print plaintiff's name)

who presently resides at _California Men's Colony (East)_ ,
(mailing address or place of confinement)

were violated by the actions of the defendant(s) named below, which actions were directed against plaintiff at

**California Men's Colony (East)**
(institution/city where violation occurred)

on (date or dates) 7/3/2020–10/7/2021, 10/3/2020–10/23/2020 _____.
                           (Claim I)            (Claim II)            (Claim III)

**NOTE:**   You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.   Defendant   **EXCEL SHARRIEFF** _____ resides or works at
                   (full name of first defendant)
                 **PO Box 4036, Sacramento CA 9581-4036**
                 (full address of first defendant)
                 **COMMISSIONER OF THE CALIFORNIA BOARD OF PAROLE HEARINGS**
                 (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

 **Agent for the State of California.**

2.   Defendant   **JOHN DENVIR** _____ resides or works at
                   (full name of first defendant)
                 PO Box 4036, Sacramento CA 9581-4036
                 (full address of first defendant)
                 **DEPUTY COMMISSIONER OF THE CALIFORNIA BOARD OF PAROLE HEARINGS**
                 (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

 **Agent for the State of California.**

3.   Defendant   **S. SILVA** _____ resides or works at
                   (full name of first defendant)
                 **Highway 1, PO Box 8101, San Luis Obispo, CA 93409**
                 (full address of first defendant)
                 **CDCR FACILITY CAPTAIN @ CMC EAST**
                 (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:

 **Peace Officer within the California Department of Corrections and Rehabilitation.**

on (date or dates) <u>7/3/2020–10/7/2021</u> , <u>10/3/2020–10/28/2020</u> , _____ .
(Claim I)　　　　　　　　　(Claim II)　　　　　　　　　(Claim III)

**NOTE:**　　You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

4. Defendant　<u>M. FERNANDEZ</u> _____ resides or works at
(full name of first defendant)

<u>Highway 1, PO Box 8101, San Luis Obispo, CA 93409</u>
(full address of first defendant)

<u>CDCR FACILITY LIEUTENANT @ CMC EAST</u>
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual　☒ official capacity.

Explain how this defendant was acting under color of law:

<u>Peace Officer within the California Department of Corrections and Rehabilitation.</u>

5. Defendant　<u>D. TOMELLOSO</u> _____ resides or works at
(full name of first defendant)

<u>Highway 1, PO Box 8101, San Luis Obispo, CA 93409</u>
(full address of first defendant)

<u>CDCR FACILITY SERGEANT @ CMC EAST</u>
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual　☒ official capacity.

Explain how this defendant was acting under color of law:

<u>Peace Officer within the California Department of Corrections and Rehabilitation.</u>

5. Defendant　<u>D. Daniel</u> _____ resides or works at
(full name of first defendant)

<u>Highway 1, PO Box 8101, San Luis Obispo, CA 93409</u>
(full address of first defendant)

<u>CDCR FACILITY CORRECTIONAL OFFICER @ CMC EAST</u>
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual　☒ official capacity.

Explain how this defendant was acting under color of law:

<u>Peace Officer within the California Department of Corrections and Rehabilitation.</u>

**Page 3a of 6**

7. Defendant   S. CHISHOLM _____ resides or works at
(full name of first defendant)
Highway 1, PO Box 8101, San Luis Obispo CA 93409
(full address of first defendant)
CDCR FACILITY PSYCHOLOGIST @ CMC EAST
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:
Defendant was acting in the course of CDCR employment.

8. Defendant   D. SAMUEL _____ resides or works at
(full name of first defendant)
Highway 1, PO Box 8101, San Luis Obispo CA 93409
(full address of first defendant)
Chief Deputy Warden within CDCR @ CMC EAST
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:
As Chief Deputy Warden within the California Department of Corrections and Rehabi-
litiation.

## D. CLAIMS*

CLAIM I

The following civil right has been violated:

a). Defendants Excel Sharrieff and John Denvir denied Plaintiff fair and impartial consideration for parole suitability; acting in concert with underground Board of Parole Hearings (BPH) policy that systematically denies parole to prisoners with mental illness and substances abuse histories. Violating the substantive due process protections that are afforded to the plaintiff under the Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; and Article I, Section 7 of the California State Constitution.

b). Defendant S. Silva, acting in supervisory capacity, denied the plaintiff substantive due process protections that Plaintiff is afforded under the Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; Article I, Section 7 of the California State Constitution; and the Rules and Regulations of the California Department of Corrections and Rehabilitation;

(Claims continued at pp. 5a-5b)

Supporting Facts:  Include all facts you consider important.  State the facts clearly, in your own words, and without citing legal authority or argument.  Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

1.   On October 7, 2021 Defendants Excel Sharrieff and John Denvir, Commissioner and Deputy Commissioner for the California Board of Parole Hearings acted as the panel for Plaintiff's Parole Suitability Hearings. Defendants Sharrieff and Denvir determined that Plaintiff was not suitable for parole. Defendants Sharrieff and Denvir based their decision [in part] on information that is contained in Rules Violation Report (RVR) Number 7016135. Which had been written by Defendant Daniel, and found (by Senior Hearing Officer) Defendant Fernandez: did not meet the burden of proof to substantiate the charge. Although aware that Plaintiff was not guilty of the allegations of RVR 7016135 as written, Defendants Sharrieff and Denvir acted to disregard that fact, and used the RVR, in conjunction with Plaintiff's history of mental health issues to support their denial of parole. Moreover, Defendants Sharrieff and Denvir acted to place Plaintiff in category with "a lot of people" with "delusional" and "twisted thinking that's not grounded in reality." (Exhibit A at p. 30, ll. 1-10).

(Facts continued at pp. 5c-5e)

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

CLAIMS (CONTINUED):

acted willfully negligent of the entrusted Peace Officer duties and obligations that required him to classify and process Rules Violation Report (RVR) Log Number 7016135 (which contained false report of a code 1 security activation) in accord to CDCR and Office of Administrative Law policy.

c). Defendant M. Fernandez, acting in capacity as Senior Hearing Officer of RVR 7016135, denied the plaintiff substantive due process protections that Plaintiff is afforded under the Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; Article I, Section 7 of the California State Constitution; and the Rules and Regulations of the California Department of Corrections and Rehabilitation; willfully acting under code of silence to shield Defendants Daniel and Tomelloso from possible penalty of law for [knowingly] submitting/approving RVR 7016135 which contained false report of a code 1 security activation.

d). Defendant D. Tomelloso denied the plaintiff substantive due process protections that are afforded to Plaintiff under the First, Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; Article I, Section 7 of the California State Constitution; and the Rules and Regulations of the California Department of Corrections and Rehabilitation; willfully acted in concert with Defendant Daniel to retaliate against the plaintiff for exercising his right to protected speech; approved RVR 7016135 with full knowledge that the RVR contained false report of a code 1 security activation.

e). Defendant D. Daniel denied the plaintiff substantive due process protections that are afforded to Plaintiff under the First, Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; Article I, Section 7 of the California State Constitution; and the Rules and Regulations of the California Department of Corrections and Rehabilitation; [knowingly] submitted false information on RVR Number 7016135, in retaliation, for Plaintiff having filed Staff Complaint Log Number CMC-E-20-12288 against him.

f). The action of Defendant Daniel in using physical force against the plaintiff,

CLAIMS (CONTINUED):

without warrant, because Plaintiff adhered to Health Care Services Covid-19 social-distancing precautions, was done maliciously and sadistically. Denying Plaintiff the substantive due process protections that are afforded to Plaintiff under the Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; Article I, Section 7 of the California State Constitution; and the Rules and Regulations of the California Department of Corrections and Rehabilitation.

g). The actions of defendant Daniel in using food as disciplinary sanction, because Plaintiff adhered to Covid-19 social-distancing precautions constitutes cruel and unusual punishment and denied Plaintiff the substantive due process protections that are afforded to Plaintiff under the Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; Article I, Section 7 of the California State Constitution; and the Rules and Regulations of the California Department of Corrections and Rehabilitation.

h). Defendant S. Chisholm, acting under code of silence, to shield Defendant Tomelloso from possible prosecution, denied Plaintiff the substantive due process protections that are afforded to Plaintiff under the Fifth, Six, Eight and Fourteenth Amendments to the United States Constitution; Title II of the Americans With Disabilities Act; Protection and Advocacy for Individuals with Mental Illness Act (PAMII); Section 504 of the Rehabilitation Act; Article I, Section 7 of the California State Constitution; and the Rules and Regulations of the California Department of Corrections and Rehabilitation.

CLAIMS II

i). The action of defendant D. Samuel, in response to Plaintiff's complaints as documented on Institutional Grievance Numbers 05727 and 06610 were done with deliberate indifference to Plaintiff's health and safety fears of contracting Covid-19 and denied Plaintiff the substantive due process protections that are afforded to the plaintiff under the Eight and Fourteenth Amendments to the United States Constitution; the California State Constitution; Title II of the Americans With Disabilities Act; Section 504 of the Rehabilitation Act; and the Rules and Regulations of the California Department of Corrections and Rehabilitation.

SUPPORTING FACTS (CONTINUED):

2.    On September 29, 2021 California Department of Corrections and Rehabilitation, Office of Appeals (OOA) exhausted all remedies available to Plaintiff within CDCR, on Appeal Log#: 122857. Plaintiff initiated #122857, because unknown CDCR personnel lost or destroyed Plaintiff's Appeal of Grievance log number 107777. Within #122857, Plaintiff alleged that lost/destruction of # 107777 caused interference with due process of unaddressed staff complaint issues that were brought on Appeal log number 33088 (appealing grievance decision of RVR No. 7016135), which was remanded to the California Men's Colony (CMC) Office of Grievance (OOG) to have those unaddressed staff complaint matters properly addressed (Exhibit B).

3.    On April 30, 2021 the California Board of Parole Hearings retained Attorney Patric Sparks, under Americans With Disabilities Act, to represent the plaintiff, who is a patient under the Mental Health Services Delivery System (MHSDS); member of class-action under Coleman v. Schwarzenegger; having a treatment history that includes placements in the Department of State Hospitals (DSH), Department of Mental Health (DMH), Enhanced Outpatient Program (EOP), and Correctional Clinical Case Management System (CCCMS) since 2005; [and] who suffers from frequent episodes of severe depression and debilitating migraine headaches, that have substantially disrupted his ability to sleep, work, communicate, concentrate, and think: even with the aid of medication (Exhibit C).

4.    On April 16 or 17, 2021 Plaintiff was interviewed by CDCR Correctional Lieutenant Lamb, who is not a defendant in this action, on Grievance #107777. Plaintiff informed Lieutenant Lamb that RVR 7016135 was false report; that investigation would reveal that "code 1" call reported by Defendant Daniel, on RVR, to be not true.

5.    On April 13, 2021 California Department of General Services declined to process Plaintiff's retaliation, reprisal, and code of silence  State Tort Claim No. 20011040: [with nexus to RVR No. 7016135] against defendants Fernandez, Tomelloso, and Daniel (Exhibit D).

6.    On April 13, 2021 CMC OOG informed Plaintiff that Grievance (#107777) had been initiated by OOG to remedy unaddressed Staff Complaint issues that were identified by OOA in Appeal Log # 33088 [having nexus to RVR 7016135] (Exhibit E).

SUPPORTING FACT (CONTINUED):

7. On December 23, 2020 CDCR/OOA exhausted all administrative process on Appeal Log# 33088: with remedy for CMC/OOG to open [new grievance] log number (107777) to address unaddressed staff misconduct claims (Exhibit F).

8. On November 2, 2020 CDCR/OOA exhausted all remedies available to Plaintiff on Appeal of Staff Complaint Log# 12778 [having nexus to RVR No. 7016135] that was submitted against Defendant Tomelloso (Exhibit G).

9. On October, 31, 2020 CDCR/OOA exhausted all remedies available to Plaintiff within CDCR on Appeal Log# 12288 [having nexus to RVR No. 7016135] that was submitted against Defendant D. Daniel (Exhibit H).

10. On August 27, 2020 Plaintiff alleged that Defendant S. Chisholm acted under code of silence to protect defendant Tomelloso from misconduct as documented on Appeal No. 12778 (Referent: Exhibit G)

11. On July 29, 2020 defendant M. Fernandez [acting in capacity as Senior Hearing Officer of RVR 7016135] ceded to Plaintiff's Covid-19 safety concerns; rejected defendant Daniel report of a thrown Identification Card (ID); found that the RVR contained factually false information of a [phantom] call to Central Control for a code 1 activation; electing to find Plaintiff guilty of included charge 3004(b)[1]: Disrespect w/out Potential for Violence/Disruption (Exhibit I).

12. On July 17, 2020 defendants Daniel, Tomelloso, and S. Silva [respectively] wrote, approved, and classified RVR 7016135 knowing and/or failing to know that the RVR contained factually false information of a code 1 call (Exhibit I at p. 9).

13. On July 6, 2020 Plaintiff filed Staff Complaint 12778 against defendant D. Tomelloso: within the body of the complaint, Plaintiff alleges that defendant Tomelloso acted unethically to discourage Plaintiff from practicing social-distancing and redressing his fear of contracting Covid-19: by use of the grievance process. Conjunctively, Plaintiff was interviewed by defendant Chisholm, following the above stated encounter with defendant Tomelloso. Plaintiff informed defendant Chisholm during that interview, that defendant Tomelloso had threatened to "paper-fuck" him for not speaking with her. Defendant Chisholm's reply was "I know. She told me." (Exhibit G).

## SUPPORTING FACTS (CONTINUED):

14. On July 6, 2020 Plaintiff filed Staff Complaint 12288 against defendant D. Daniel. Within the body of the complaint, Plaintiff states that defendant Daniel used physical force to withhold food as a disciplinary sanction, because Plaintiff practiced social distancing to safeguard against contracting Covid-19 (Exhibit H).

## SUPPORTING FACTS II:

15. On October 28, 2020 CDCR/OOA exhausted all remedies available to Plaintiff on Inmate Appeal Log Number 06610. Within that appeal Plaintiff alleged that [Defendant D. Samuel's] Institutional Level Decision acted to contravene CDCR policy to mitigate the spread of Covid-19. And gave approval to CDCR custody personnel use of unauthorized disciplinary methods to facilitate Plaintiff's force compliance to conditions that abandon Covid-19 safety protocol (Exhibit J).

16. On October 3, 2020 CDCR/OOA exhausted all remedies available to plaintiff on Inmate Appeal Log Number 05727. Within that appeal Plaintiff alleged that [Defendant D. Samuel's] Institutional Level Decision acted to ELIMINATE Departmental mandates to mitigate the spread of Covid-19 (Exhibit K).

## DEMAND FOR JURY TRIAL

17. This is a civil rights action filed by Ronald Gene Robinson, a state prisoner, for damages and injunctive relief under 42 U.S.C. § 1983 alleging claims against BPH and CDCR personnel that include ADA and RA violations, retaliation for speech and denial of due process, misuse of force, and denial of food as a disciplinary sanction in violation of the First, Fifth, Eight and Fourteenth Amendments to the United States Constitution. Plaintiff also alleges the torts of reprisal, harassment, battery and assault on him, because he engaged in Health Care Service precautions to avoid exposure to Covid-19. This Court has jurisdiction under 28 U.S.C. § 1343(4) for violations of the 1871 Civil Rights Enforcement Act, including 42 U.S.C. §1983 and under 28 U.S.C. § 1331. The acts and omissions complained of in this action occurred within the Central District of California. Therefor, venue lies in this district pursuant to 28 U.S.C. §1391. With Court having supplemental jurisdiction over the plaintiff's California tort claims under 28 U.S.C. § 1367.

Page 5e

18. The actions of defendants Sharrieff and Denvir, that included the plaintiff with a lot of other people, who have mental health histories, to support their delusional and twisted thinking claims, denied the plaintiff of his right to a fair individual assessment for parole suitability. Furthermore, the defendants deliberate indifference to the Senior Hearing Officer's determination that RVR Number 7016135 [upon which Defendant's accusation of delusion was based] did not meet the standard of proof to substantiate the charges and acted, in concert with Defendants diagnosis of delusion, to deprive Plaintiff of a fair suitability hearing.

19. The individual and collective conduct of all defendants named in this civil action, have no rational connection between CDCR regulations, or any legitimate government interest that justifies the deprivation of Plaintiff's constitutional rights and effort to remain safe from Covid-19. And demand jury trial.

I, Ronald Gene Robinson, declare under penalty of perjury that all of the foregoing is true and correct to the best of my knowledge, understanding and belief.

Signed: _____        Dated: February _3_, 2022
         Ronald G. Robinson

## E.  REQUEST FOR RELIEF

I believe that I am entitled to the following specific relief:

A.   That the court issue Declaratory Judgment stating that:

1.   The actions and failures of defendants Sharrieff and Denvir denied Plaintiff a fair and impartial consideration for parole suitability; denying Plaintiff of the substantive due process protections that he has set forth in his claims for relief.

2.   Defendants Samuel, Silva, Fernandez, Tomellose, Daniel, and Chisholm denied Plaintiff the substantive due process rights as set forth in Plaintiff's claims for relief.

B.   That the court issue injunction:

1.   Prohibiting prison officials from enforcing [forced] compliance to seating within dinning halls that does not allow Plaintiff to practice Covid-19 safety precautions.

2.   Directing that RVR Log Number 7016135 be removed from Plaintiff's CDCR and institutional files.

3.   Directing that Plaintiff be returned before BPH and given fair and individual assessment for parole consideration.

C.   That the court award general/punitive damages, and such further relief to Plaintiff as it deems appropriate.

2. 3. 2022
*(Date)*

*(Signature of Plaintiff)*

Ronald Gene Robinson, C47067
CMC EAST, PO BOX 8101
San Luis Obispo CA 93409-8101

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RONALD GENE ROBINSON v. EXCEL SHARRIEFF, et. alia
Case Name: Plaintiff v. Defendants

EXHIBITS

1.   EXHIBIT A:          BPH TRANSCRIPT

2.   EXHIBIT B:          INMATE APPEAL LOG NUMBER 122857

3.   EXHIBIT C:          BPH NOTICE OF ATTORNEY REPRESENTATION FOR SUITABILITY
                         HEARING

4.   EXHIBIT D:          DEPARTMENT OF GENERAL SERVICES CLAIM NOTICE

5.   EXHIBIT E:          GRIEVANCE RECEIPT [RE: LOG # 107777

6.   EXHIBIT F:          INMATE APPEAL LOG NUMBER 033088

7.   EXHIBIT G:          INMATE APPEAL LOG NUMBER 12778

8.   EXHIBIT H:          INMATE APPEAL LOG NUMBER 12288

9.   EXHIBIT I:          RVR LOG NUMBER 7016135

10.  EXHIBIT J:          INMATE APPEAL LOG NUMBER 06610

11.  EXHIBIT K:          INMATE APPEAL LOG NUMBER 05727

EXHIBIT A:

BOARD OF PAROLE HEARINGS TRANSCRIPT

PAROLE SUITABILITY HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Parole    CDC Number: **C47067**
Consideration Hearing of:

RONALD EUGENE ROBINSON



CALIFORNIA MEN'S COLONY

SAN LUIS OBISPO, CALIFORNIA

10/07/2021

1:03 PM


PANEL PRESENT:
EXCEL SHARRIEFF, Presiding Commissioner
JOHN DENVIR, Deputy Commissioner



OTHERS PRESENT:
RONALD ROBINSON, Inmate
PATRICK SPARKS, Attorney for Inmate
MICHAEL CAVES, Deputy District Attorney
UNIDENTIFIED, Correctional Officers



Transcribed by:

Arnel Mendoza

2

INDEX

| | Page |
|---|---|
| Proceedings | 03 |
| Case Factors | 06 |
| Pre- Commitment Factors | -- |
| Post-Commitment Factors | 41 |
| Parole Plans | 43 |
| Closing Statements | 55 |
| Recess | 59 |
| Decision | 60 |
| Adjournment | 75 |
| Transcript Certification | 76 |

3

1                          **PROCEEDINGS**

2     **DEPUTY COMMISSIONER DENVIR:**   We're on the record.

3     **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you,

4 Commissioner. We are on the record. Today's date is

5 October 7th, 2021. The time now is 1:03 PM. This is the

6 eighth subsequent parole suitability hearing for Mr.

7 Ronald Robinson; last name is spelled R-O-B-I-N-S-O-N,

8 CDCR number C47067, who is present in the BPH Hearing Room

9 located at the California Men's Colony in San Luis Obispo,

10 California. However, due to the social distancing

11 mandates, we are conducting this hearing via video

12 conference. At the appropriate time, we'll kindly ask all

13 the participants to state their first and last name, spell

14 their last name, as well as identify if they're appearing

15 via video and/or audio. Mr. Robinson, can you hear and see

16 me, sir?

17     **INMATE ROBINSON:**   Yes.

18     **PRESIDING COMMISSIONER SHARRIEFF:**   And for the

19 record, I can hear and see you. Deputy Commissioner, can

20 you hear and see Mr. Robinson?

21     **DEPUTY COMMISSIONER DENVIR:**   Yes, I can. Thank you.

22     **PRESIDING COMMISSIONER SHARRIEFF:**   Very well.

23 Everyone, this proceeding is being audio recorded as

24 mandated by Penal Code Section 3042(b), and will be

25 transcribed as the official record of this hearing. No

4

1   other recordings are authorized, including a recording

2   made available via video conference software. A violation

3   of this provision may result in the exclusion from this or

4   future hearings. At this time, we will go around the video

5   conference and introduce ourselves. Once again, good

6   afternoon, everyone. My name is Excel Sharrieff; my last

7   name is spelled S-H-A-R-R-I-E-F-F, Commissioner for the

8   Board of Parole Hearings. I'm appearing via video using

9   Microsoft Teams. And Deputy Commissioner?

10      **DEPUTY COMMISSIONER DENVIR:**   Yes. John Denvir, D-E-

11   N-V-I-R, Deputy Commissioner, Board of Parole Hearings,

12   uh, also, uh, participating by video via Microsoft Teams.

13      **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you, sir.

14   Mr. Robinson, will you please state your full name, spell

15   your last name, and also provide the Panel with your CDCR

16   number, sir?

17      **INMATE ROBINSON:**   My name is Ronald Robinson, R-O-

18   B-I-N-S-O-N, C47067.

19      **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you, sir.

20   Next, we'll hear from inmate Counsel.

21      **ATTORNEY SPARKS:**   Patrick Sparks, S-P-A-R-K-S,

22   Attorney for Mr. Robinson.

23      **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you, sir. We

24   also have a representative from the Kern County District

25   Attorney's Office, Mr. Caves?

5

1     **DEPUTY DISTRICT ATTORNEY CAVES:**   My name is Michael

2  Caves. The last name is C-A-V-E-S. I'm a Deputy District

3  Attorney and I'm appearing via video conferencing on

4  Microsoft Teams.

5     **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you, Mr.

6  Caves. As indicated earlier, Mr. Robinson is seated in the

7  Board of Parole Hearing Room, located at the prison. Also

8  present are Correctional Officers. They're there for

9  security purposes. They may be relieved from time to time

10  throughout this hearing. And that identifies all parties

11  present at this time. Mr. Robinson, at this time, we will

12  take a brief recess just a minute or so, to allow the

13  Deputy Commissioner to check the audio recording. The time

14  now is 1:06 PM.

15     **DEPUTY COMMISSIONER DENVIR:**   We're off the record.

16

17                    **[RECESS]**

18

19

20

21

22

23

24

25

1    **DEPUTY COMMISSIONER DENVIR:**   We're back on the

2    record.

3    **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you,

4    Commissioner. We're back on the record. The time now is

5    1:06 PM. All parties who were previously present prior to

6    our brief recess have returned. We took that recess to

7    allow the Deputy Commissioner to check the audio

8    recording, and he has reported that the recording is

9    adequate. Mr. Robinson, you have the right to be present

10   and be with the Board in person. Do you accept that this

11   video conference satisfies that right?

12   **INMATE ROBINSON:**   Yes, sir.

13   **PRESIDING COMMISSIONER SHARRIEFF:**   You also have the

14   right to have your Attorney present in the Board Room, as

15   well. Do you accept that your Attorney's appearance by

16   video conference and your ability to have privileged

17   communications with your Attorney via telephone satisfies

18   that right?

19   **INMATE ROBINSON:**   Yes, sir.

20   **PRESIDING COMMISSIONER SHARRIEFF:**   Very well.

21   According to the Panel's review on Mr. Robinson's central

22   file, he was received from the County of Kern on May 10th,

23   1982, for the controlling offense of murder-second. We

24   note that Mr. Robinson is currently 61 years of age. He

25   qualified as a youth offender. He committed the crime

7

1    while under the age of 26. He does have a youth offender

2    parole eligible date of August 12th, 1999 and he also

3    qualifies as an elderly offender with an elderly offender

4    parole eligible date of June 30th, 2020. So, with that

5    being said, Mr. Robinson, the Panel will give great weight

6    to your youth offender factors and also special

7    consideration to your elderly offender factors as well in

8    determining your suitability for parole this afternoon.

9    And Mr. Robinson, we do note also that you were served

10   your ADA rights, that's your Americans with Disability Act

11   rights. And before we continue on further, we want to make

12   sure that you have been accommodated for this hearing. And

13   so, Mr. Robinson, simple question, sir. We note,

14   currently, you're a CCCMS. Is that correct, sir?

15        **INMATE ROBINSON:**     Yes, sir.

16        **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. With that

17   being said, you have been afforded an Attorney, Mr.

18   Sparks. Now, Mr. Robinson, it indicates that you do not

19   have any physical disabilities or any cognitive

20   disabilities. Is that also correct, sir?

21        **INMATE ROBINSON:**     Yes, sir.

22        **PRESIDING COMMISSIONER SHARRIEFF:**  All right. We do

23   note that very, uh, you have a grade point level of 8.8.

24   Indicates that you have been engaged in college uh,

25   classes. Is that also correct, sir?

1    INMATE ROBINSON:    Yes, sir.

2    PRESIDING COMMISSIONER SHARRIEFF:  Alrighty. So Mr.

3    Robinson, when everyone was introducing ourselves on the

4    record, could you hear everyone clearly?

5    INMATE ROBINSON:    Yes, sir.

6    PRESIDING COMMISSIONER SHARRIEFF:  Do you have any

7    issues walking toward from your housing location?

8    INMATE ROBINSON:    No, sir.

9    PRESIDING COMMISSIONER SHARRIEFF:  So, Mr. Robinson,

10   this is a yes or no question. Yes, or no, sir? As you seat

11   before the Panel this afternoon, are you taking any

12   medication whatsoever, sir?

13   INMATE ROBINSON:    Yes, sir.

14   PRESIDING COMMISSIONER SHARRIEFF:  Another yes or no

15   question. As you sit before the Panel this afternoon, are

16   you exposed to any negative side effects to those

17   medications, sir?

18   INMATE ROBINSON:    No, sir.

19   PRESIDING COMMISSIONER SHARRIEFF:  Mr. Robinson, is

20   there anything that's preventing you from participating in

21   today's hearing?

22   INMATE ROBINSON:    No, sir.

23   PRESIDING COMMISSIONER SHARRIEFF:  Counsel, are you

24   aware of any additional accommodation your client might

25   need?

1    **ATTORNEY SPARKS:**    No, thank you.

2    **PRESIDING COMMISSIONER SHARRIEFF:**  All right. Thank

3    you. So, Mr. Robinson, the Panel has reviewed your entire

4    electronic central file, which includes your previous

5    hearing, as well as the most recent Comprehensive Risk

6    Assessment, and we're going to incorporate by reference

7    all those documents for this hearing. And as you're well

8    aware of Mr. Robinson, what that means is simply we're not

9    going to go line by line through your file. This is not

10   how we review it. We're here to try to understand who you

11   are. So, we want to focus our time on having a discussion

12   with you and hearing from you. And so, with that being

13   said, we just want to incorporate your central file for

14   this hearing. And if we do not mention any topics, it's

15   not that we did not consider it because we are going to

16   consider all relevant and reliable information. But if

17   there's something that you feel is very important that you

18   wanted to discuss, please, you let us know. We'll take

19   that time out and discuss those items. Okay, sir?

20   **INMATE ROBINSON:**    Yes, sir.

21   **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. And as

22   indicated, uh, we did receive, uh, some additional

23   documents, uh, Mr. Robinson, and we see the remorse, um,

24   statement, with it includes an insight, uh, recovery

25   <inaudible> prevention, your explanation of your

1    institutional behavior and programming, your coping

2    practices, um, mental health concerns, and also parole

3    plans as well. Is that a thorough list, Mr. Robinson?

4         INMATE ROBINSON:    Yes, sir.

5         PRESIDING COMMISSIONER SHARRIEFF:   Okay. And

6    everything we just mentioned, uh, comprise of three pages

7    in total, is that also correct Mr. Robinson?

8         INMATE ROBINSON:    Yes, sir.

9         PRESIDING COMMISSIONER SHARRIEFF:   Okay. Now, at the

10   appropriate time, we're going to discuss those items as

11   well, as many as we can get to, Mr. Robinson. And Mr.

12   Robinson, the Panel also reviewed the confidential portion

13   of your central file in addition to your central file. And

14   we will advise you and your, your, your Attorney in

15   accordance with Title 15 if we rely on any information

16   contained therein. Counsel, any preliminary objections,

17   sir?

18        ATTORNEY SPARKS:    Um, no.

19        PRESIDING COMMISSIONER SHARRIEFF:   Okay. Mr.

20   Robinson, can we have you raise your right hand, sir? Mr.

21   Robinson, do you solemnly swear or affirm that the

22   testimony you give today will be the truth, the whole

23   truth, and nothing but the truth, sir?

24        INMATE ROBINSON:    Yes, sir.

25        PRESIDING COMMISSIONER SHARRIEFF:   Okay, sir. You can

11

1  put your hand down. So, Mr. Robinson, we do note that you

2  had your seventh subsequent parole suitability hearing,

3  November 7th, 2018. Is that correct, sir?

4       **INMATE ROBINSON:**    Yes, sir.

5       **PRESIDING COMMISSIONER SHARRIEFF:**   All right. And, do

6  you know why you were denied parole?

7       **INMATE ROBINSON:**    I believe it was a lack of, uh,

8  enough insight. Uh, I think that was the primary, uh,

9  concern. Uh—

10      **PRESIDING COMMISSIONER SHARRIEFF:**   We're going to

11  refresh your, your, your memory, sir, because we, we do

12  have the documents in front of us, and you were right. It

13  was a lack of adequate insight and understanding into the

14  causative factors of your life crime. They also note your

15  extensive history of institutional misconduct, your rules

16  violations, in particular. But we also note that the CRA

17  at that time wasn't supported and the Panel also encourage

18  you to involve yourself in Criminal Thinking, um, CGA, and

19  also Substance Abuse Program. You recall that, sir?

20      **INMATE ROBINSON:**    Yes, sir.

21      **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. So, let's do

22  this Mr. Robinson, and what we're going to do, sir, we're

23  very methodical this Panel. And we're not going to just

24  ask you just open-ended question just to hear some

25  narrative. We want to just narrow this down. Okay, sir?

1    And so, we're going to focus first on the life crime, the

2    murder-second. Okay, sir?

3        INMATE ROBINSON:    Yes, sir.

4        PRESIDING COMMISSIONER SHARRIEFF:  Now, the—, sir,

5    the, the questions that we're going to ask you, sir, is

6    basically about the causative factors why this crime

7    occurred. And what we want you to do, Mr. Robinson, is put

8    the reasons why this, this crime occurred in the order of

9    importance. So, reason number one, reason number two,

10   reason number three. Once you do that, sir, we have that

11   list. We're going to take our time. We're going to talk

12   about each one with you. Okay, sir?

13       INMATE ROBINSON:    Yes, sir.

14       PRESIDING COMMISSIONER SHARRIEFF:  All right. So,

15   let's take your time and you give us the first one only,

16   that was the number one reason why this crime occurred.

17       INMATE ROBINSON:    Because I had involved into

18   criminal behavior.

19       PRESIDING COMMISSIONER SHARRIEFF:  Okay. So, just

20   criminal behavior?

21       INMATE ROBINSON:    That, yes, yes, sir.

22       PRESIDING COMMISSIONER SHARRIEFF:  Okay. And, and

23   then, that's the reason why we have you before us, because

24   you're—, we are the expert. Okay? And so, that's why we

25   want to make sure that we're clear. So, the number one

1    reason is just criminal behavior. Is that correct?

2         **INMATE ROBINSON:**     Yes, sir.

3         **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. Number two.

4         **INMATE ROBINSON:**     Number two reason that this crime

5    happened, I can only tell you I was a criminal at the

6    time.

7         **PRESIDING COMMISSIONER SHARRIEFF:**   Yeah. That's

8    number one. Okay? So, let's not go back to number one.

9    Okay? So number one, criminal behavior. We got that down

10   already. So, what's number two? Well, let's do it this

11   way, Mr. Robinson. Now, how about this? If the—, if

12   criminal behavior is all you have, then let's dissect to

13   that. Okay? So, within criminal behavior, what was the

14   number one issue that you had with regards to your

15   criminal behavior? And, and what we mean by that is, the

16   criminal behavior is a huge umbrella, so to speak, right?

17   It covers a lot. And so, what we want you to do is be able

18   to pinpoint within that criminal behavior, it is this, it

19   was that. Right? So, criminal behavior is, is, is the

20   tree, so to speak. And the fruit, right? The fruit, that's

21   the other issues. And so, what was the worst fruit of that

22   criminal behavior tree do you think caused this horrible

23   crime, murder?

24        **INMATE ROBINSON:**     Lack of, uh, respect for human

25   life.

14

1    **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So, that's

2    number one. What's number two?

3        **INMATE ROBINSON:**    Greed, selfishness.

4        **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So, which

5    one? Greed or selfishness?

6        **INMATE ROBINSON:**    Greed.

7        **PRESIDING COMMISSIONER SHARRIEFF:**  Greed. Okay. And

8    what we'll do is, we'll just put greed/selfishness just

9    out, out of fairness. And out of that criminal behavior,

10   we have lack of respect for human life, greed/selfishness,

11   and what's number three?

12       **INMATE ROBINSON:**    Not respecting the rights of, of

13   others, not respecting s—.

14       **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So, we're

15   going to unpack this, but we want to make sure we have

16   this list and that it is a solid list. Okay? So, number

17   one reason for this crime is criminal thinking a huge, the

18   tree of criminal thinking. From that tree of criminal

19   thinking, you plucked out number one reason is lack of

20   respect of human life, correct?

21       **INMATE ROBINSON:**    Not in that order, but I, I, yes.

22   I think I'm not <inaudible>.

23       **PRESIDING COMMISSIONER SHARRIEFF:**  So, let's slow it

24   down. We're going to put it in the right order. Okay? So,

25   let's slow it down. So, criminal behavior, that's the

1   overall broad picture. Okay? Now, we're going to—, now

2   you're going to break it down for us. So, out of criminal

3   thinking, you give us the order of importance, right? So,

4   the number one reason, number two, number three. So,

5   what's number one again, out of the criminal behavior?

6       INMATE ROBINSON:    Lack of respect for other

7   person's life, human life.

8       PRESIDING COMMISSIONER SHARRIEFF:  Okay. And so,

9   number two, we have greed and selfishness. Correct?

10       INMATE ROBINSON:    Yes, sir.

11       PRESIDING COMMISSIONER SHARRIEFF:  And number three,

12   we have, no respect for other's rights. Is that correct?

13       INMATE ROBINSON:    Yes, sir.

14       PRESIDING COMMISSIONER SHARRIEFF:  Okay. Now, before

15   we move away from this tree of criminal behavior, so to

16   speak, is there any other fruits of that tree you think

17   you can pluck out and hand to us that contributed to this,

18   this horrible crime?

19       INMATE ROBINSON:    I, I can't, I can't pluck.

20       PRESIDING COMMISSIONER SHARRIEFF:  So, so before we,

21   before we press any further, sir, we used to have a simple

22   question for you. Mr. Robinson, are you prepared for this

23   hearing this afternoon?

24       INMATE ROBINSON:    Yes, sir.

25       PRESIDING COMMISSIONER SHARRIEFF:  Okay. So, now that

```
 1    you told that you're prepared for this hearing, we're

 2    going to press on it now, right? And now, we're going to

 3    just, just cut to the chase here because if you can't give

 4    us the answer, we're going to help you with the answers.

 5    Okay? Now, you told us that criminal behavior is the

 6    reason why this murder occurred and you put it in order of

 7    importance, lack of respect for human life,

 8    greed/selfishness, and no respect for the rights of

 9    others. Correct?
```

10        **INMATE ROBINSON:**     Yes, sir.

11        **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. Do you think

12    that you were a violent person at the time—

13        **INMATE ROBINSON:**     Yes.

14        **PRESIDING COMMISSIONER SHARRIEFF:**   —of the crime?

15    Okay.

16        **INMATE ROBINSON:**     Yes, sir.

17        **PRESIDING COMMISSIONER SHARRIEFF:**   All right. So

18    let's, do you think violence should be on the list?

19        **INMATE ROBINSON:**     Yes, sir.

20        **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. Do you think

21    that you have problems with, with substance abuse at that

22    time as well?

23        **INMATE ROBINSON:**     Yes, sir.

24        **PRESIDING COMMISSIONER SHARRIEFF:**   Do you think that

25    substance abuse played a role in this crime?

17

1     **INMATE ROBINSON:**     Yes, sir.

2     **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. What about

3   anger? Do you think that anger played a role in this crime

4   at all?

5     **INMATE ROBINSON:**     Yes, sir.

6     **PRESIDING COMMISSIONER SHARRIEFF:**   Do you think anger

7   should be on this list?

8     **INMATE ROBINSON:**     Yes, sir.

9     **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. All right.

10  This is your eighth subsequent parole suitability hearing,

11  Mr. Robinson and we—, this Panel were very transparent

12  and, and it's kind of concerning that after all these

13  years, age of 61, you've been in prison since 1982, this

14  Panel had to bring out violence, substance abuse, and

15  anger. Why is that?

16    **INMATE ROBINSON:**    I believe, uh, and I'm not trying

17  to make an excuse. I just believe the setting is, is, uh,

18  is, uh, I'm, I'm receiving some kind of block with the

19  setting.

20    **PRESIDING COMMISSIONER SHARRIEFF:**   So, Mr. Robinson,

21  just, we want to put this on the record. Okay, sir? And,

22  and we understand the setting is far as perhaps on the

23  video, perhaps it's a bad day, but hopefully, you are well

24  aware that the Governor understands that as well. And he's

25  put in place some safe corners for inmates, so that if

1  you're feeling this type of way, even on the day of your

2  hearing, you can say, hold off, hold on, I'm going to

3  postpone this to the next available calendar. Let me get

4  my things together and organize, because I'm not feeling

5  this right now. In the past, pre-COVID, couldn't do that,

6  couldn't do it, but now you can. And so, before we

7  continue on and really get deeper into this, do you want

8  to talk to your Attorney or do you want to just move

9  forward?

10      **INMATE ROBINSON:**    I will move forward. I would like

11  to say, uh, I believe that I'm prepared for the hearing,

12  right? It is, I'm not polished person. I'm not, you know,

13  I haven't did any script. I wrote everything down. I

14  write. That's my process to get things out. When I'm in

15  <inaudible> of people, sometimes, my words don't come out

16  correct. Sometimes, I don't respond correctly, but I know

17  I have answers. I have the answers.

18      **PRESIDING COMMISSIONER SHARRIEFF:**  What we're going

19  to do, Deputy Commissioner, we can put this in the uh,

20  bits as well. We're going to give Mr. Robinson additional

21  time as well. And so, we're going to give that to—, an

22  added accommodation for you, Mr. Robinson, additional

23  time. Okay? And so, whatever time you need, um, even with

24  clarifying question, if you need additional time, we'll

25  give you additional time. Okay? We're here to just help

19

1   you. Okay, sir?

2       INMATE ROBINSON:     Yes, sir.

3       PRESIDING COMMISSIONER SHARRIEFF:   Okay. So, we're

4   going to slow it down. Based on that, we're going to slow

5   it down and we're going to focus on violence, anger, and

6   substance abuse. Okay? So, <inaudible>. Let's talk about

7   anger. Have you been involved in Anger Management? Yes, or

8   no?

9       INMATE ROBINSON:     Yes, sir.

10      PRESIDING COMMISSIONER SHARRIEFF:   Okay. And also,

11  also includes AVP. We saw that in 2020, you're involved in

12  AVP as well, correct?

13      INMATE ROBINSON:     Yes, sir.

14      PRESIDING COMMISSIONER SHARRIEFF:   Okay. Now, this

15  should be an easy question for you. Based on your, your

16  studies in Anger Management and AVP, what type of emotion

17  is anger?

18      INMATE ROBINSON:     What type of emotion? This is uh,

19  uh, anger is actually a secondary emotion.

20      PRESIDING COMMISSIONER SHARRIEFF:   Bingo. There you

21  go. What does that mean, though?

22      INMATE ROBINSON:     That means that there is an

23  underlying factor to what—, some—, whatever would trigger

24  my anger.

25      PRESIDING COMMISSIONER SHARRIEFF:   Okay. Bingo again.

1    Okay? And so, hopefully, you get more relaxed because you

2    answer these questions correctly at this point. Okay? So,

3    with that being said, uh, Mr. Robinson, if anger is a

4    secondary emotion and you indicated that anger played a

5    role in this crime, what was the primary emotion in this

6    crime?

7         **INMATE ROBINSON:**    Primary was fear, actually.

8         **PRESIDING COMMISSIONER SHARRIEFF:**  Fear. Okay.

9         **INMATE ROBINSON:**    Yep.

10        **PRESIDING COMMISSIONER SHARRIEFF:**  Now, explain. Fear

11   of what? For who?

12        **INMATE ROBINSON:**    Actually, honestly, because,

13   well, I don't want to sound like I'm making an excuse, but

14   there was a tug of war going on between me and Mr.

15   Dishman, for the money in a bag. In this process, I

16   believe I was lost my power and there was a fear factor

17   involved.

18        **PRESIDING COMMISSIONER SHARRIEFF:**  And so, again, the

19   question is fear of, fill in the blank force.

20        **INMATE ROBINSON:**    Fear of uh, I-I don't—, I want to

21   say, I felt like it was fear, oh, on this fear of losing

22   control of the situation.

23        **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So, you

24   thought that you were losing control of the situation and

25   that caused you to become angry?

1    **INMATE ROBINSON:**    Yes, sir.

2    **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. All right.

3    So, I'm—, well we—, I'm not going to do, I'm not going to,

4    I'll let the Deputy Commissioner talk about that further

5    as well. And so, let's just fast forward, because you had

6    your hearing in 2018, and one of the issues that the

7    previous Panel had was your behavior in prison, your

8    RVR's. And not only just your RVR, but your underlying

9    conduct and your behavior, attitude move—, as you move

10   throughout the prison system. Do you recall that

11   discussion that we had with you?

12   **INMATE ROBINSON:**    Yes, sir.

13   **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. And then

14   soon thereafter, well, not that soon thereafter, at least

15   two years after in 2020, that counseling chrono, that 128-

16   A, and again, it's not about the counseling chrono. We're

17   just looking at that underlying behavior, right? That

18   what, what, what was going on with you and how we read it,

19   and you let us know we're correct or correct in this, that

20   at some point in time, you refuse the order to sit down

21   and eat at that table. Is that correct, sir? Yes, or no?

22   **INMATE ROBINSON:**    Yes, sir.

23   **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. Yes, or no,

24   Mr. Robinson. The officer gave you an opportunity to add

25   an option to eat in your cell. Is that correct, sir?

22

1    INMATE ROBINSON:    No, sir.

2    PRESIDING COMMISSIONER SHARRIEFF:  Okay. So, he did

3    not? Okay. What about this one? Did you ever become angry

4    in that situation? Yes, or no?

5    INMATE ROBINSON:    I believe I became angry. Yes.

6    PRESIDING COMMISSIONER SHARRIEFF:  Okay. Now, I

7    should say, I believe I became angry. You don't, you don't

8    recall a solid yes or no?

9    INMATE ROBINSON:    Yes, sir. I became angry. Yep.

10    PRESIDING COMMISSIONER SHARRIEFF:  Why, why did you

11    say it that way earlier?

12    INMATE ROBINSON:    Because honestly, I don't want to

13    admit that I was angry. And I know that's uh—

14    PRESIDING COMMISSIONER SHARRIEFF:  Look. Now, but

15    what <inaudible> though? Why—, I mean, why not admit to

16    who you are, right? The laws at all. What's wrong with

17    that?

18    INMATE ROBINSON:    Um, um, um, at my hearing and,

19    and you assessing me and I'm being assessed, and I know

20    that it's an ugly look for me. An anger <inaudible>.

21    PRESIDING COMMISSIONER SHARRIEFF:  But it was more,

22    what looks even uglier is in what we call Impression

23    Management, right? When you have something that you're

24    trying to hide and you're, you're trying to impress us by

25    not just that, hey, listen, look at my pimple, right?

23

1  Instead, you're holding your hand over the pimple. But no,

2  come on. We all, we all have flaws. Right? And so, you

3  would think that at your eighth subsequent parole suitably

4  hearing, and you know this, you just put everything on the

5  table, right? That, that's about being open and honest,

6  right? Transparent, correct?

7      **INMATE ROBINSON:**    Yes.

8      **PRESIDING COMMISSIONER SHARRIEFF:**  Do you think that

9  the 12-steps has, has, have you utilized the 12-steps,

10 sir? Yes, or no?

11     **INMATE ROBINSON:**    I, I'm utilizing not as scripted

12 by NA or AA. I, I, I know I utilize.

13     **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. And so,

14 let's just put it this way because AA and NA talks about

15 the 12-steps. And so, the question is very simple. Do you

16 use the 12-steps in your sobriety? Just say yes or no.

17     **INMATE ROBINSON:**    Yes, sir.

18     **PRESIDING COMMISSIONER SHARRIEFF:**  Do you think that

19 at the hearing to the 12-steps moving forward helps you in

20 your sobriety? Yes, or no?

21     **INMATE ROBINSON:**    Yes.

22     **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. Now, do you

23 read the 12-steps at all?

24     **INMATE ROBINSON:**    I, I do not. Not daily. And I

25 actually have them before me now. So, I have and I know, I

1    know one, and I know that I practiced.

2        PRESIDING COMMISSIONER SHARRIEFF:  Okay. Do you

3    practice step five?

4        INMATE ROBINSON:    Step five?

5        PRESIDING COMMISSIONER SHARRIEFF:  Without looking at

6    it.

7        INMATE ROBINSON:    Yes.

8        PRESIDING COMMISSIONER SHARRIEFF:  Without looking at

9    it. Okay? What is step five?

10       INMATE ROBINSON:    Okay. I don't—, I have to because

11   I don't, I don't memorize them. I don't—,

12       PRESIDING COMMISSIONER SHARRIEFF:  Okay.

13       INMATE ROBINSON:    I haven't—

14       PRESIDING COMMISSIONER SHARRIEFF:  That's fine. So

15   we, usually, what we try to do is we try to assess whether

16   or not you internalize it without, without reading the

17   documents. Then next, read the document and then you let

18   us know. Do you practice step five?

19       INMATE ROBINSON:    Step five? Yes.

20       PRESIDING COMMISSIONER SHARRIEFF:  And what is step

21   five?

22       INMATE ROBINSON:    Step five is we admitted to God,

23   to ourselves, and to another human being, the exact nature

24   of our wrongs.

25       PRESIDING COMMISSIONER SHARRIEFF:  Okay. That also

1   includes, when you say other human beings, Panel members.

2   What it means wrongdoings, 128-A's, where you were angry,

3   right? Instead of hiding a ball, you say, hey, God, I

4   messed up. You say, you tell yourself you messed up, and

5   you tell everyone else, I messed up. I was angry. I

6   dropped the ball in 2020. That's step five, right?

7        INMATE ROBINSON:     Yes, sir.

8        PRESIDING COMMISSIONER SHARRIEFF:  Okay. And do you

9   think that today that you, when we asked you that

10  question, do you think that you were practicing step five?

11       INMATE ROBINSON:     No, sir. May I elaborate?

12       PRESIDING COMMISSIONER SHARRIEFF:  Absolutely.

13       INMATE ROBINSON:     Okay. So, I don't believe that my

14  anger in that moment was inappropriate. I did not act out

15  violently because of anger. I did not have the—

16       PRESIDING COMMISSIONER SHARRIEFF:  Before you

17  continue, quick question for you before you continue. Yes,

18  or no? At any point in time, did you toss or even throw

19  your ID towards the officer?

20       INMATE ROBINSON:     No.

21       PRESIDING COMMISSIONER SHARRIEFF:  Okay. Did you ever

22  send your ID in his direction? In the officer's direction?

23       INMATE ROBINSON:     No, sir.

24       PRESIDING COMMISSIONER SHARRIEFF:  Okay. Continue on

25  why you think your anger wasn't involved in this.

1   **INMATE ROBINSON:**   Because I did not do any of the

2   things that were written in that port—, report that you're

3   talking about now, throwing the ID or saying anything that

4   would have been construed as something to, uh, incite

5   violence. No, it was just simply. Yes, sir.

6   **PRESIDING COMMISSIONER SHARRIEFF:**   And before you

7   continue, we're not talking about violence. Okay? We're

8   just talking about anger and you already told us you were

9   angry. And so now, you're backtracking. Okay? We're not

10   actually, this is—, so, just this, just to be clear, just

11   to be clear, were you angry at the time of that counseling

12   chrono? Yes, or no?

13   **INMATE ROBINSON:**   Yes.

14   **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. Now, why

15   were you angry?

16   **INMATE ROBINSON:**   Because COVID-19 was a real

17   situation. People were getting sick and I did not want to

18   get sick. So, the officer wanted me to sit at a table with

19   somebody without my mask on. So, he's been inconsiderate

20   of me for as I'm concerned. So, I said no, and, and yes, I

21   had some anger with, with that.

22   **PRESIDING COMMISSIONER SHARRIEFF:**   Now, did you say

23   no in a polite way?

24   **INMATE ROBINSON:**   No, sir. I said no.

25   **PRESIDING COMMISSIONER SHARRIEFF:**   And, are inmates

1    allowed to eat their food in their cell?

2        **INMATE ROBINSON:**    Uh, until after—

3        **PRESIDING COMMISSIONER SHARRIEFF:**  At that time, sir.

4        **INMATE ROBINSON:**    I believe—, nope. No, sir. No.

5        **PRESIDING COMMISSIONER SHARRIEFF:**  So, at the time of

6    that's, that 128, you're telling the Panel that inmates

7    were not allowed to eat their food in their cell?

8        **INMATE ROBINSON:**    Not that I'm aware of.

9        **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. What I'm

10   going to do, Mr. Robinson, I'm going to hand it over to

11   Deputy Commissioner because what we want to do is really

12   focus and streamline on the, the salient issues. Deputy

13   Commissioner?

14       **DEPUTY COMMISSIONER DENVIR:**    Okay. Um, Mr. Robinson,

15   your last hearing, uh, was there at CMC on November 7th of

16   '18, resulted in a three-year denial. You had an

17   administrative review that was denied, um, to advanced

18   your hearing 12/23/19. Um, just kind of looking at the big

19   picture here, sir, um, I, I counted 46 RVR's. Does that

20   number sound about right to you? I went through, uh, your

21   three back files of RVR's and counted them up. Does that

22   number sound about right?

23       **INMATE ROBINSON:**    Yes, sir.

24       **DEPUTY COMMISSIONER DENVIR:**    Okay. And in the area

25   of overt violence, meaning, you actually engaged in

1   violent behavior. Uh, I counted a total of 14, uh, from,

2   uh, first one in '86. And then, last one in 2000 with that

3   participation in a melee. Does that sound right to you?

4        INMATE ROBINSON:    I don't know about two—, in 2000?

5        DEPUTY COMMISSIONER DENVIR:   Mm-hm. Participation in

6   a melee.

7        INMATE ROBINSON:    I don't, I don't, I don't—

8        DEPUTY COMMISSIONER DENVIR:   Anyway, okay. You don't

9   remember? All right. Um, and then, seven RVR's for

10  weapons, uh, from '84 to '88. So, that's been quite a

11  while that's happened, right?

12       INMATE ROBINSON:    Yes.

13       DEPUTY COMMISSIONER DENVIR:   Okay. Um, of more

14  recent concern, although it does track all the way back in

15  your disciplinary history is, um, it's not unusual for me

16  to see this, um, is, RVR is for defiance of authority.

17  You, would you agree over the years, you've had a problem

18  in that area?

19       INMATE ROBINSON:    Yes.

20       DEPUTY COMMISSIONER DENVIR:   Okay. Um, and I saw, it

21  looked like, well, I counted a total of at least 13, um,

22  RVR's related to defiance of authority, but just looking

23  on how that's been an issue for you, say in the last, uh,

24  15 years, you had, uh, a disobeying orders in October of

25  '05 for refusing a direct order. In Oct—, again, in

1    October of '05, a disobeying orders. Uh, June of '06, uh,

2    actually, three in June of '06. And then, willfully

3    delaying a peace officer in May of '12. Um, your 128-A's

4    have included uh, a disrespect in '06 and then this most

5    recent, uh, RVR, uh, excuse me, 128-A for disrespect

6    without poten—, potential for violence disruption that

7    you've been talking about with the Commissioner. Correct?

8        INMATE ROBINSON:    Yes.

9        DEPUTY COMMISSIONER DENVIR:    Okay. Do you see how

10   defiance of authority or, um, an unwillingness or

11   inability to follow the rule, follow orders has been a

12   pattern for you over the years?

13       INMATE ROBINSON:    Yes, I can see that.

14       DEPUTY COMMISSIONER DENVIR:    Okay. Why, what make—,

15   what do you think that is? What, what's driving that

16   defiance?

17       INMATE ROBINSON:    Uh, so, this is, this is, uh,

18   it's difficult to answer this type of question because—,

19   well, let me just answer the question. All right? So.

20       DEPUTY COMMISSIONER DENVIR:    Just do the best you

21   can, sir. That's all.

22       INMATE ROBINSON:    Okay. So, I don't believe I

23   actually have a problem with authority. I believe I have a

24   problem with perceived abuse of authority. I think that's

25   what the problem.

1     **DEPUTY COMMISSIONER DENVIR:**   Okay. Well, huh. Well,

2    that's interesting. What—, so what—, do you believe your

3    view of, see, I know you have a history of mental health

4    issues and I've seen a lot of people. They have, their

5    thinking is such that they think that officers are out to

6    get them, that they're out to cause them problems, they're

7    out to single them out to do this, that, or the other for,

8    but it's really tied to, to use the term for mental

9    health, that delusional thinking. It's, it's, it's, it's

10   twisted thinking that's not grounded in reality. Do you,

11   do you think that's an issue for you?

12     **INMATE ROBINSON:**   I don't believe so.

13     **DEPUTY COMMISSIONER DENVIR:**   Okay.

14     **INMATE ROBINSON:**   My, my point for that would be

15   let's take the last, uh, RVR. Again, we're in a pandemic

16   situation.

17     **DEPUTY COMMISSIONER DENVIR:**   Okay.

18     **INMATE ROBINSON:**   So, I don't want to sit at a

19   table with someone who may very well give me something

20   that I can't get rid of. So, we're all wearing masks.

21   We're, we're mer—, we're wearing masks in the chow hall.

22   There's no six feet distance between us. We're sitting

23   directly across from each other. For three weeks, I had

24   not been sitting with anyone. When an officer would ask me

25   to sit with somebody, I would say no as I said to the

```
 1    officer who ended up giving me the RVR. He did not want to
 2    accept that. So, I attempted to hand him my ID. He
 3    wouldn't take it. I put it back in my pocket. After I did
 4    that, I attempted to eat. He handcuffed me. He hand me off
 5    my te—, table and handcuffed me and took me to the change
 6    in the program office.
 7         DEPUTY COMMISSIONER DENVIR:   Okay.
 8         INMATE ROBINSON:   This is where—
 9         DEPUTY COMMISSIONER DENVIR:   Well that, that, w-
10    well, the Commissioner and I are kind of looking at this
11    is, you know, you have a history. Now, it's going aback a
12    ways, that I was just reading your RVR from back in '97,
13    when you were threatening staff. Uh, prior to that, you
14    had battered peace officers. You know? So, when this
15    particular officer writes this up and says, I told him to
16    sit at the end of the table as what's protocol at that
17    time. Uh, he refused, I said, I allow—, you can go in your
18    room and, or in your cell and eat. He didn't want to, you
19    know, you—, have you read this 115? This 128-A?
20         INMATE ROBINSON:   I have read the 115, sir.
21         DEPUTY COMMISSIONER DENVIR:   Okay. I mean, it, it
22    sounds like from his re—, re—, you know, recounting of
23    this situation, you know, he said, sit there. You said no.
24    And then he said, you know, either, let me just read it. I
25    explained further to Robinson the daily movement
```

32

1    programming. Memorandum stated the inmate shall sit two at

2    a table at opposite ends in the chow hall and Robinson

3    against enemies, he's not sitting with another inmate. I

4    further explained to Robinson, if you didn't want to sit

5    with anyone, you could take his ID card or, or his meal

6    and eat in his cell. Robinson became angry and stated, I'm

7    not going anywhere and threw his ID card. It's hard to

8    believe an officer would risk his employment risk. You

9    know, he's writing this up, uh, standing by this. Why, why

10   do you think he's singling you out to set you up to have

11   an issue with this RVR, sir, by perjuring himself?

12       **INMATE ROBINSON:**    Okay. So, to try to explain this

13   to you without sounding delusional, right?

14       **DEPUTY COMMISSIONER DENVIR:**    Right.

15       **INMATE ROBINSON:**    Yes, I get that.

16       **DEPUTY COMMISSIONER DENVIR:**    Okay.

17       **INMATE ROBINSON:**    So, for, for about three weeks,

18   officers have been trying to get me to sit with other

19   inmates in the chow hall at the table. We are in a

20   pandemic. I have been refusing to do that. I would hand

21   them to my I—, my ID, some would take it, some would not.

22   Nobody ever tried to force me to sit with another inmate

23   once they understood that I wanted to sit by myself. So,

24   on this particular day, Officer Daniel or Dennis, he

25   decides he's going to handcuff me as opposed to allow me

1    to sit in my t—, by myself. There was no discussion about,

2    uh, uh, going to the cell, eating in your cell. There was

3    none of that. So, after what, this is just my assessment

4    and it may sound delusional to you, for me, it sounds

5    absolutely logical because I know what happened. So, after

6    this thing took place, I actually wrote a staff complaint

7    against Mr. Dennis. So, approximately, what? 14 days after

8    that, I get wrote up.

9        **DEPUTY COMMISSIONER DENVIR:**  Hm.

10       **INMATE ROBINSON:**  So, uh, I, my assessment is

11   retaliation, for me writing him up. Had I not wrote him

12   up, I may very well not have gotten the 115.

13       **DEPUTY COMMISSIONER DENVIR:**  Okay.

14       **INMATE ROBINSON:**  I mean, it's unusual to, to wait

15   that long to write an inmate up for, for, for some

16   violation.

17       **DEPUTY COMMISSIONER DENVIR:**  Did, did, did you see—

18       **PRESIDING COMMISSIONER SHARRIEFF:**  Deputy

19   Commissioner, I just wanted to interrupt—

20       **INMATE ROBINSON:**  —that memorandum?

21       **PRESIDING COMMISSIONER SHARRIEFF:**  —one s—

22       **DEPUTY COMMISSIONER DENVIR:**  Oh, okay.

23       **PRESIDING COMMISSIONER SHARRIEFF:**  I just wanted to

24   interrupt one second. So, I just want to make sure that

25   the reader of this transcripts understand, because it

1  keeps staying saying 115 and no, this was a counseling

2  chrono, —

3      **DEPUTY COMMISSIONER DENVIR:**   Yeah.

4      **PRESIDING COMMISSIONER SHARRIEFF:**   —128-A. So, it's

5  not, this is not, this is not uh, RVR or 115. Okay? And

6  so, before I hand it back over to Dep—, to Deputy

7  Commissioner, Mr. Robinson, just a simple question for

8  you, sir. Looking back at this now, right? Looking back at

9  it now, hindsight is 2020, right? Based on what you

10 learned in your programming, how do you think you should

11 have handled that situation differently? I-if you could,

12 if you could go back in time, what will you do different,

13 sir?

14     **INMATE ROBINSON:**   I would have left the chow hall

15 and got me something to eat from elsewhere.

16     **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you.

17     **DEPUTY COMMISSIONER DENVIR:**   Okay. W-well, I was

18 going to go back to, and the, the reason we're referring

19 it to RVR, it, they, since CDCR changed their way of, um,

20 you know, documenting RVR's versus 128-A's, they're,

21 they're documented the same way with rules violation

22 report, and then, they're either a counseling, uh,

23 disciplinary or an RVR. So, uh, it is a 128-A. And

24 hopefully, that's clear on the record that this is not an

25 RVR. It's a counseling, uh, chrono.

35

1     **INMATE ROBINSON:**   May 1 interject, please?

2     **DEPUTY COMMISSIONER DENVIR:**   Sure.

3     **INMATE ROBINSON:**   May I—, it was dropped from, from

4     a 115, serious 115 to a counseling chrono once the hearing

5     officer understood that the information in that com—, that

6     report was not true. Namely, there was no cold one, uh,

7     uh, violent—, it was no cold one called for. That

8     information in there is inaccurate. And when the hearing

9     tenant understood that, he, uh, he dropped it to a 128.

10     **DEPUTY COMMISSIONER DENVIR:**   Okay. But it sounds—

11     **INMATE ROBINSON:**   That was the report basi—

12     **DEPUTY COMMISSIONER DENVIR:**   It sounds similar to

13     the situations I've heard before, sir, where a certain

14     officer, an inmate will get used to a particular officer

15     who lets them do something that's not exactly in step with

16     the rules. Uh, be it uh, hanging a curtain up or putting a

17     window covering. And then, a new officer comes in and

18     says, wait a minute, the rules say, you can't do this. And

19     they call you on it. Um, you know, because there's

20     apparently this memorandum signed by the facility captain

21     that says, two people sit at opposite ends of the table.

22     And you know, that, he was a—, the officer was able to

23     show you that. Now, other officers weren't really

24     enforcing that. Apparently, they would let you sit by

25     yourself. But when this officer says, these are the rules,

1    do you think you reacted appropriately or not?

2        INMATE ROBINSON:   I, uh, Commissioner, Deputy

3    Commissioner, uh, Mr. Denvir?

4        DEPUTY COMMISSIONER DENVIR:   Yes, sir?

5        INMATE ROBINSON:   You describe—, you're describing

6    opposite ends of the table as though we're at uh, uh,

7    picnic table when it's uh, like rectangular type of thing.

8    Just not that type of table. There are no opposite ends.

9    There's, it's, it's, it's a table that's basically an

10   octagon, I guess? Uh, and so, one person—, there's four

11   people, it's four, uh, four seats at the table. And the

12   distance between each of the seats across from each other

13   is, may be about three feet.

14       DEPUTY COMMISSIONER DENVIR:   Mm-hm.

15       INMATE ROBINSON:   So, there's no opposite, there's

16   no opposite as though, uh, I would be sitting, uh, at a

17   picnic table and someone else is sitting on the opposite

18   side of the pictic—, picnic table. There's, there's,

19   that's not what it is.

20       DEPUTY COMMISSIONER DENVIR:   Okay.

21       INMATE ROBINSON:   And so—

22       DEPUTY COMMISSIONER DENVIR:   No, I, I've been in

23   those dining halls, sir. I know we're not talking about

24   uh, you know, Hearst Castle, 12-foot table—

25       INMATE ROBINSON:   No. So—

1     **DEPUTY COMMISSIONER DENVIR:**   But—

2     **INMATE ROBINSON:**   So, excuse me to cut you off,

3 sir. So, when you, when you, when you <inaudible> opposite

4 ends of, at, of the, of the table, uh, in your mind, what

5 are you seeing?

6     **DEPUTY COMMISSIONER DENVIR:**   Well, I'm seeing two

7 inmates facing each other as opposed to being right next

8 toward each other.

9     **PRESIDING COMMISSIONER SHARRIEFF:**   We're not here to

10 answer, uh, all those type of questions. And so, Mr.

11 Robinson, the, the, the whole thing about this 128-A is

12 it's all about your behavior, sir, sir. Right? And it's

13 about that continued behavior coupled with all those 46

14 uh, rules violations, right? And so, we're not just

15 looking at this 128 in isolation. We're looking at your,

16 your behavior as a whole. And before I hand it back to

17 Deputy Commissioner, let me just say this, Mr. Robinson.

18 When I read your file, when I first looked at the case, I

19 got happy. I said, oh, dealt with Mr. Robinson in 2018,

20 give him clear instructions. He's going to be granted

21 parole? Right? Easy peasy. Open the file in detail, look a

22 little further. What does he do? What does he do? He act

23 like he doesn't want to go home. And in, and the CRA even

24 mentions that further down. I'm going to discuss that

25 later, but Mr. Robinson, I was very disappointed to see

1  you behave in this manner. Based on our conversation in

2  2018, it was assuring that no more problems at all and you

3  are going to program and get out of here, but no, you

4  reverted back to your old self. And that's what Deputy

5  Commissioner is trying to figure out is why? Why'd you do

6  that?

7      **DEPUTY COMMISSIONER DENVIR:**   Yeah, I, I know—

8      **INMATE ROBINSON:**    That, that was it.

9      **PRESIDING COMMISSIONER SHARRIEFF:**  You can answer

10  then, and then Deputy Commissioner. Thank you.

11     **INMATE ROBINSON:**    Oh, you ask—, you, that was it.

12  Okay. So, okay. So, you, you, uh, Commissioner are taking

13  the report to be accurate, and I'm saying that it's not.

14     **PRESIDING COMMISSIONER SHARRIEFF:**  No. No, no, no,

15  no. Stop right there. Stop right there. I'm taking the—,

16  well, you said to be accurate, that you could have handled

17  this in a different manner and you did not. That's what

18  the focus on. Even if, if we use your narrative, sir, if

19  we use your explanation of what happened, it's still looks

20  bad. You, your, your understanding and so is like, if it

21  was a 115, 128-A, nothing even happened at all that your,

22  your attitude behind that and your lack of coping skills,

23  dealing with frustration and anger, because that's what

24  led up to the murder. And so, in 2020, if you still

25  struggling with those coping skills that caused someone to

1   lose their life, do you understand our concern?

2   **INMATE ROBINSON:**   I understand your concern, and I

3   believe that you are absolutely incorrect about your

4   assessment. You're putting a puzzle together, sir. In my

5   opinion, that just doesn't go together. You—

6   **PRESIDING COMMISSIONER SHARRIEFF:**  Let's do this.

7   Mr., Mr. Robinson, let's do this. Let's slow it down.

8   Okay? Let's just slow it down and just make sure that

9   we're clear. Yes, or no? Do you think that you could have

10  handled that situation in a better manner, sir? Yes, or

11  no?

12  **INMATE ROBINSON:**   I think I handled it

13  appropriately.

14  **PRESIDING COMMISSIONER SHARRIEFF:**  No. See, see what

15  you're doing? You're, you're, you're, you're, what you're

16  doing right now, you're showing that criminal thinking.

17  We're trying to understand Mr. Robinson, as eighth

18  subsequent hearing, we asked him a very direct question.

19  What does he do? He just disrespects authorities. Say, you

20  know what, I'm going to, I'm going to ignore your question

21  and I'm going to answer what I want to answer. Do you not

22  see that to be a problem, sir?

23  **INMATE ROBINSON:**   Yes.

24  **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So, let's

25  just slow it down. Okay? And just please answer the

1   question. Show us that you're the type of person that if

2   we released, no problems at all. Because the Deputy

3   Commissioner and I, we also had a discussion. What if

4   you're pulled over by the police and you know you didn't

5   run a stop sign? You know you stopped a few seconds and

6   look to the left and look to the right, and then, you

7   proceeded. But this bad cop, he sees you and he profiles

8   you. Right? And he pulls you over and he starts to say, he

9   didn't run the stop sign. If you don't have coping skills

10  Mr. Robinson, it could turn out to be extremely ugly, even

11  though you were in the right. Do you not see that?

12       **INMATE ROBINSON:**    Yes.

13       **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. Deputy

14  Commissioner, can you please—

15       **DEPUTY COMMISSIONER DENVIR:**    Okay.

16       **PRESIDING COMMISSIONER SHARRIEFF:**   —take it further?

17       **DEPUTY COMMISSIONER DENVIR:**    Yeah. I'm, I'm re—,

18  I'll go ahead and move on from that. Um, so, how many, uh,

19  units, I saw you completed since the last hearing uh, two

20  three-unit classes, uh, withdrew from two others from

21  February, uh, 2020 through January 26 of '21. And then,

22  with on-site college, you completed, uh, three three-unit

23  classes, uh, with two withdrawals. Um, does that all sound

24  right to you? So, you completed five three-unit classes

25  since the last hearing, sir?

1        **INMATE ROBINSON:**    I'm not sure. I may have.

2        **DEPUTY COMMISSIONER DENVIR:**    Okay. That's what's

3    documented. And that's a good number of classes. 15 units,

4    uh, in a three-year period. That's good. Um, yeah. In, in

5    one semester you took on, I think a total of five classes,

6    uh, but withdrew from two, and then you took four classes

7    and withdrew from two, but completed five. So, that's

8    good. Um, you've, you've been in OSRT now, uh, since

9    December 1st of '20. And you were also in, uh, from

10   December 24th of '19 through 10/19/20. You haven't

11   completed levels, but you have gotten all satisfactory uh,

12   progress reports. Does that sound right to you?

13       **INMATE ROBINSON:**    Yes, sir.

14       **DEPUTY COMMISSIONER DENVIR:**    Okay. Uh, historically,

15   also PIA fabrics, canteen worker, yard worker. So, that

16   seems to be going pretty well. Now, uh, your self-help

17   since the last pre—, hearing, a little bit limited, uh,

18   you've, you opted out of LTOP after completing a couple of

19   tracks in that. Uh, 09/06/18, you completed an eight-hour

20   grow workshop, July of 19, July 13 of '19. You went to,

21   well, you did the Doing Way Program from July of '19

22   through March of 2020. What was that, sir?

23       **INMATE ROBINSON:**    Oh, the Daring Way.

24       **DEPUTY COMMISSIONER DENVIR:**    Daring way. I'm sorry.

25       **INMATE ROBINSON:**    It, it, that program actually,

```
1   uh, was dealing with shame, which is, uh, one of the
2   triggers that I have that actually contributes a lot of
3   anger.
4       DEPUTY COMMISSIONER DENVIR:   Anything else you got
5   out of that?
6       INMATE ROBINSON:   That, uh, particular program, uh,
7   actually goes back to the address issues of my childhood
8   and, uh, something that happened to me when I was a kid.
9   And, uh, is it—, a lot, well, contributed to a lot of uh,
10  anger that I had.
11      DEPUTY COMMISSIONER DENVIR:   Okay. Well, that's
12  good. That, you found it helpful then?
13      INMATE ROBINSON:   Yes, sir.
14      DEPUTY COMMISSIONER DENVIR:   Okay. And then
15  thereafter, I think you mentioned to the Commissioner, you
16  completed the AVP workshop for 20 hours in February of
17  2020. Uh, anything else you've done since the last hearing
18  in the area of self-help?
19      INMATE ROBINSON:   Well, every day, I pray. I'm, I'm
20  a Muslim and, and that program is, is the best self-help I
21  think I can ever have. And I think that <inaudible> excuse
22  me, you know, I'm, I'm processing all of this and I know
23  it looks bad, you know? So, I just want to apologize.
24      DEPUTY COMMISSIONER DENVIR:   Yeah, no need to
25  apologize. We know these are stressful situations, so, um,
```

1  so, and, and you're involved in daily prayer?

2      INMATE ROBINSON:     Yes.

3      DEPUTY COMMISSIONER DENVIR:    Okay. All right. Um,

4  we, uh, we didn't have anything in the way of letters, um,

5  with respect to parole plans. Do you have a plan on what

6  you would do if you're released on parole?

7      INMATE ROBINSON:     No, sir. I, I, that is the email

8  uh—

9      DEPUTY COMMISSIONER DENVIR:    Oh, okay. I'm sorry.

10  There's a letter. Uh, you, uh, the letters themselves

11  aren't attached, but you're right. Parole plans. Do you,

12  do you have those letters somewhere? HealthRIGHT 360,

13  Timelist, Amity—

14      INMATE ROBINSON:     Those, those, I wrote all of

15  those and I got responses back. I didn't get acceptance

16  letters back and that's—

17      DEPUTY COMMISSIONER DENVIR:    Okay.

18      INMATE ROBINSON:     —what I was waiting for. That's

19  why I didn't send this information to the parole desk

20  because I was still waiting to see if I will get the

21  acceptance letters. I did—, that didn't happen and I'm

22  just simply uh—

23      DEPUTY COMMISSIONER DENVIR:    Okay.

24      INMATE ROBINSON:     —I don't know if COVID-19 got

25  something to do with it. I don't know.

1   **DEPUTY COMMISSIONER DENVIR:**   Do you know when you

2   send them off?

3   **INMATE ROBINSON:**   I started in, like May? Somewhere

4   else in there.

5   **DEPUTY COMMISSIONER DENVIR:**   Okay. Do you know which

6   one you'd prefer to go to if you were granted?

7   **INMATE ROBINSON:**   I would prefer to go to Islam LA

8   Housing or either the, uh, Golden Path. Uh, these are, uh,

9   Islamic housing, uh, transitional housing.

10   **DEPUTY COMMISSIONER DENVIR:**   Okay.

11   **INMATE ROBINSON:**   If not there, um, HealthRIGHT 360

12   or, or Amity, Amity Ranch.

13   **DEPUTY COMMISSIONER DENVIR:**   Okay. And then, uh,

14   what, uh, what'd you do in terms of supporting yourself

15   out there? Do you have plans in that regard?

16   **INMATE ROBINSON:**   I, well, I know that last

17   transition house uh, or transitional houses the last time

18   around in 2018 said that they—, the transitional homes

19   would help me with, uh, employment.

20   **DEPUTY COMMISSIONER DENVIR:**   Okay. Um, what was the

21   last year you separated from any gang activity?

22   **INMATE ROBINSON:**   That would be '86.

23   **DEPUTY COMMISSIONER DENVIR:**   86? And do you know

24   your clean and sober date? The last date you used, any

25   drugs or alcohol?

1    **INMATE ROBINSON:**    Not the date, but I know the

2   year. It's 2006.

3    **DEPUTY COMMISSIONER DENVIR:**   Okay. And let me see

4   here. You did a relapse and re—, prevention. It looks like

5   it's about two paragraphs and you may basically boil it

6   down to, Islam is my relapse prevention plan. Is that more

7   or less stand by that? That's, that's what your plan is to

8   remain clean and sober?

9    **INMATE ROBINSON:**    Yes, sir.

10    **DEPUTY COMMISSIONER DENVIR:**   Okay. All right. Well

11   then, I'm going to go ahead and defer back to the chair. I

12   thank you very much, sir.

13    **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you, Deputy

14   Commissioner. And Mr. Robinson, before we continue to

15   further, sir, we want to slow it down a little bit and

16   give you an opportunity, sir. And this is what we mean by

17   additional time. So, is there anything that we've

18   discussed so far that you want to take your time and

19   elaborate, or discuss, or explain further? And we don't

20   want you to rehash what you already said, but explained

21   further. Anything you have. Go ahead, sir.

22    **INMATE ROBINSON:**    Uh, no, sir.

23    **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. Mr. Robinson

24   let's just talk on a, on a very simple and basic level.

25   First and foremost, since your last hearing in 2018, no

1  serious rules violations. Is that correct, sir?

2  **INMATE ROBINSON:**   That's, that's what I was uh,

3  that's what was said. Yes.

4  **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. Since your

5  last 2018 hearing, no overt violence. Is that correct?

6  **INMATE ROBINSON:**   Yes, sir.

7  **PRESIDING COMMISSIONER SHARRIEFF:**  Never been

8  involved from violence?

9  **INMATE ROBINSON:**   No, sir.

10  **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So Mr.

11  Robinson, it is clear that you're not the same person who

12  were involved in these 46 rules violations, right? Maybe

13  it's due to your age, maybe it's due to the program that

14  you've been involved, involved in, maybe it has to do when

15  it's sum up? Right? Or the combination of everything

16  together. But clearly, you can see that you're not the

17  same person who committed this horrible crime, right? Now,

18  can you also see that there are some remaining um, issues

19  of the younger version of Mr. Robinson that is still

20  present in Mr. Robinson. Do you see that as well?

21  **INMATE ROBINSON:**   Yes, sir.

22  **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. Now, with

23  that being said, what do you see currently that reminds

24  you of the old Mr. Robinson?

25  **INMATE ROBINSON:**   I believe that I, I can't answer,

1    that I, what do I see? Um, I'm emotional. I am an

2    emotional person—

3         **PRESIDING COMMISSIONER SHARRIEFF:**  And we all are.

4    Right? We're human beings, but the key is, right? Regulate

5    those emotions. Right? And do you think that you're able

6    to regulate your emotions at this time, as far as the

7    negative emotions? Or do you think that you still need to

8    work on those as well?

9         **INMATE ROBINSON:**    I, I, I know I n—, I know I still

10   need to work on them. However, the progress that I have

11   made, uh, I, I think it's showing that I'm the worst.

12        **PRESIDING COMMISSIONER SHARRIEFF:**  Now, and that's

13   what we want to get to because so far, we've been hearing

14   a lot of negative things about Mr. Robinson and we kind of

15   want you to just shine. Okay? And then, show us those

16   positive things. So, let's talk about some, some issues

17   and how you cope with those issues before we move on to

18   clarifying questions. Let's just deal with anger. Okay?

19   What are your coping skills today dealing with anger? It's

20   the number one—

21        **INMATE ROBINSON:**    Uh, I simply stopped, whatever.

22   Before I even give myself a chance to talk, I stopped and

23   I think. That's, that's the first thing I do.

24        **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. What else?

25        **INMATE ROBINSON:**    If I need to take a breath and

1  get some oxygen to my brain, I do that.

2      PRESIDING COMMISSIONER SHARRIEFF:  All right. Now,

3  let's go to violence. What are your coping skills that not

4  the same, if you have any additional coping skills dealing

5  with violence?

6      INMATE ROBINSON:    My thought process won't—, I,

7  that's, that's what I use, my thought process. I'm knowing

8  violence is not the, the way to resolve any, any, uh,

9  uncomfort I might be experience.

10      PRESIDING COMMISSIONER SHARRIEFF:  Okay. When was the

11  last time you were engaged in any violence? Just to be

12  clear on the record, what year?

13      INMATE ROBINSON:    I, I, I know some violence

14  happened in 2010, but I don't recall the actual violence.

15      PRESIDING COMMISSIONER SHARRIEFF:  Can you say 2010?

16      INMATE ROBINSON:    Two—, it had to be 2010.

17      PRESIDING COMMISSIONER SHARRIEFF:  Okay.

18      INMATE ROBINSON:    I believe—

19      PRESIDING COMMISSIONER SHARRIEFF:  What about, what

20  about this Mr., Mr. Robinson? This is a little easier.

21  When was the last time you were triggered to act in a

22  violent way, but you did not?

23      INMATE ROBINSON:    I would say, um, 2020.

24      PRESIDING COMMISSIONER SHARRIEFF:  Okay. When you say

25  2020, are you referring to the counseling chrono?

1    **INMATE ROBINSON:**    Yes, sir.

2    **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So let's, we

3    have to go back there, then. What, what do you think

4    triggered you to think of violence, but not act on

5    violence? So, what triggered the violent thought?

6    **INMATE ROBINSON:**    I wanted to yank away from the

7    officer when he snatched me off my uh, seat. I didn't do

8    it, though.

9    **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. What coping

10   skill at that time do you utilize?

11   **INMATE ROBINSON:**    Common sense, I believe.

12   **PRESIDING COMMISSIONER SHARRIEFF:**  Well, common sense

13   is not so common. We know that. So, let's, let's, let's—,

14   what coping skills? I a—, well, I'm pretty much, the, the

15   Panel's pretty sure we know the answer, but we want to

16   hear it from you. So, officer touch you, touches you, you

17   get a little offended and, and, and your thought process

18   is a violence, but you do not engage. So, what stopped

19   that violence other than common sense? This is why we're

20   trying to understand you. Do you understand that? So, you

21   were there, right? You're the expert. You were there. It

22   happened to you. And so, when we ask you the specific

23   question, we wanted to get an answer from you. Not from

24   us, the doctor, not from the officer, but from Mr.

25   Robinson. Okay? So, please help us try to understand you.

1   So, you didn't engage in violence. You thought about it.

2   What coping skills did you use?

3       INMATE ROBINSON:    I don't know how to define that.

4   It's, it's just, I know that would then irrational for me

5   to yank away from the officer. I, I don't know what, know

6   other way to put that.

7       PRESIDING COMMISSIONER SHARRIEFF:  You can take your

8   time, then. Why would it be irrational? Why?

9       INMATE ROBINSON:    It definitely wouldn't have

10  helped the situation.

11      PRESIDING COMMISSIONER SHARRIEFF:  Do you think it

12  would have hurt the situation?

13      INMATE ROBINSON:    Absolutely. Also, had I yanked

14  away from that officer, uh, I'm pretty sure he would have,

15  uh, possibly did something violent towards you—

16      PRESIDING COMMISSIONER SHARRIEFF   To cost out.

17      INMATE ROBINSON:    Absolutely. If I'm getting away

18  from an officer who is, has authority over me, he got me

19  in his press, he's controlling me, now, if I re—, I'm

20  resisting, hey, wait a minute. Now, really I am a problem

21  at that point. I will—

22      PRESIDING COMMISSIONER SHARRIEFF:  Okay.

23      INMATE ROBINSON:    —be a problem in the authority

24  system.

25      PRESIDING COMMISSIONER SHARRIEFF:  That all sounds to

1  this Panel, Mr. Robinson, that when you engaged in with

2  your coping skill was consequential thinking. You were

3  thinking about the consequences, right? If I do A, B is

4  going to occur, and I don't want B to occur. Does that

5  sound about right?

6       INMATE ROBINSON:    Yes, sir.

7       PRESIDING COMMISSIONER SHARRIEFF:   Okay. And see Mr.

8  Robinson, again, we're not against you. Uh, we know it's

9  inside. If it is, we going to try to dig it out of you.

10  Okay? And if you're not that the most articulate, that's

11  not a problem. All right? We don't, we don't, you're not

12  in front of us to, we're not basing your, your, your

13  answers on whether or not you are articulate or not. We

14  just want to see some understanding of why you're engaging

15  in, in negative behavior or why have you stopped? And you

16  just told the Panel that in 2020, you thought about

17  violence, but you use your coping skill of, I think about

18  the consequences. You weighed everything out. You say, you

19  know what? Let me just flow with this and not do anything

20  wrong and it further exacerbated or agitate the situation,

21  correct?

22       INMATE ROBINSON:    Yes.

23       PRESIDING COMMISSIONER SHARRIEFF:   That's progress.

24  Would you not agree?

25       INMATE ROBINSON:    Yes, sir.

1    **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. And so, Mr.

2    Robinson, we, we, and we see this, this evolution, right?

3    We see it. We see, you see it happen. It's unfolding.

4    You're not the same person, that you're unfolding. But,

5    you have to be able to just say, you know what? I'm an

6    imperfect being, flaws and all. Here I am, I made a

7    mistake. Own up to it and move on, right?

8        **INMATE ROBINSON:**    Yes.

9        **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. So, do you

10   think, it's the last time we're going to ask you this, do

11   you think in 2020 you made any mistakes with that 128-A,

12   that counseling chrono? Any mistakes?

13       **INMATE ROBINSON:**    Honestly, no, sir.

14       **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. All right.

15   Okay. So, I just want to turn our attention back to the

16   CRA because the Commissioner had some issues as well, the

17   salient issues in this case, and the doctor indicated that

18   the, on page 10 or 11, under most relevant or salient

19   issues, they talk about the, your recent rules violations,

20   as far as all your past, the 46 that the Deputy

21   Commissioner has brought up. And also, in regards to the

22   counseling chrono, the fact that you still are engaging in

23   that negative behavior, albeit it was reduced down, it's

24   still troubling. Uh, the clinician indicated that you had

25   limited substance abuse treatment. And also the, the

53

1  victim stance, and we read in your, your documentation

2  that you took offense to the, the victim stance attitude.

3  And we read why. And so, you have to repeat that. And

4  also, the errors and thinking. Your, your, your errors and

5  thinking. And so, you talk about that as well, um, that

6  thought process. And so, do you think that in 2020, you

7  still were having problems in your areas of thinking?

8      **INMATE ROBINSON:**   In 2020, in regards to, are we

9  talking to the, the 115 or the RVR?

10     **PRESIDING COMMISSIONER SHARRIEFF:**  We're actually

11  just talking about the year 2020. And so, we, we can just

12  highlight the entire, that entire year.

13     **INMATE ROBINSON:**   Errors and thinking, yes. That I

14  was—, yes.

15     **PRESIDING COMMISSIONER SHARRIEFF:**  Okay. And so, is

16  there anything, in addition to the counseling chrono, that

17  you can point to, to say, you know what? That was my area

18  of thinking there, also there, anything you can help us

19  out with, to understand who you were in 2020?

20     **INMATE ROBINSON:**   Could you repeat the question,

21  please?

22     **PRESIDING COMMISSIONER SHARRIEFF:**  Absolutely. And

23  thank you for asking us to repeat it, uh, Mr. Robinson.

24  So, the question was simply, in 2020, did you identify any

25  errors in your thinking, your, your thinking process, in

1  addition to, so we're n—, we're, we're excluding the

2  counseling chrono, we're putting that to the side, and

3  just look at the entire year as a whole. Other than that

4  2020 counseling chrono, is there, is there anything else

5  that you can point to and say, you know? The way I was

6  thinking at this issue was not that so good and the next

7  issue, anything that you can point to?

8       INMATE ROBINSON:    No, sir.

9       PRESIDING COMMISSIONER SHARRIEFF:  Okay. All right.

10  So, the most recent Comprehensive Risk Assessment does

11  rate you a moderate risk for violence at this time. And at

12  this time, it's 2:05. And so, Mr. Caves, if you're ready,

13  sir, we can go to clarifying questions.

14       DEPUTY DISTRICT ATTORNEY CAVES:    No questions.

15       PRESIDING COMMISSIONER SHARRIEFF:  Okay. Mr. Caves,

16  are you still with us? Let's take a brief recess, Deputy

17  Commissioner.

18       DEPUTY COMMISSIONER DENVIR:    We're off the record.

19

20                    [RECESS]

21

22

23

24

25

55

1    **DEPUTY COMMISSIONER DENVIR:**   We're back on the

2    record.

3    **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you, sir.

4    We're back on record. The time now is 2:19 PM. All parties

5    who were previously present prior to our brief recess have

6    returned. We have the Deputy District Attorney, uh, Mr.

7    Caves, on the line. The time now is 2:20 PM. Mr. Caves,

8    you can proceed with clarifying questions, sir.

9    **DEPUTY DISTRICT ATTORNEY CAVES:**   I have no

10   questions. Thank you.

11   **PRESIDING COMMISSIONER SHARRIEFF:**   All right. Mr.

12   Sparks, any clarifying questions, sir?

13   **ATTORNEY SPARKS:**   No, thank you.

14   **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. The time is

15   2:20 still. So, we'll go to closing statement, Mr. Caves?

16   **DEPUTY DISTRICT ATTORNEY CAVES:**   I'll waive

17   closing. Thank you.

18   **PRESIDING COMMISSIONER SHARRIEFF:**   Thank you, sir.

19   Mr. Sparks, you may begin, sir.

20   **ATTORNEY SPARKS:**   And then, Mr. Robinson came in

21   today hoping he might get a parole hearing and a release

22   date that is in light of his faith healing through Islam.

23   And yet, during the hearing, he was able to identify

24   internal triggers. The uh, beginning of the hearing, he

25   talked about um, a lack of respect for human life, greed,

```
 1    selfishness, um, as part of his criminal behavior and he
 2    acknowledged that he had violence and substance use
 3    issues, as well. So, he also understood that anger was a
 4    secondary emotion. And, you know, he wanted to make sure
 5    the Board knew that he wasn't a good talker, that his
 6    writings were more appropriate for him to articulate
 7    himself. I thought it was interesting that he described
 8    the nature of the crime as having a fear element or a tug
 9    of war over money in a bag. And, um, that the Commissioner
10    talked about the chrono and the, the fear of getting sick.
11    That maybe, he didn't want to eat at other's tables with
12    the COVID-19 going around, as a potential nexus argument
13    that went to a different direction because of the, the
14    nature of, uh, what happened, um, the angry issue at the
15    time of the crime and uh, violence issue then. And the
16    fact that he didn't act out violently during his write-up,
17    that the 115 was reduced to 128, I think it's an important
18    change in his thinking that when he says I've changed,
19    that's a reflection of his thinking as well as the
20    numerosity of prior violence in, in prison attenuated
21    since, um, some time ago now, since 2000 and, uh, no new
22    weapons charges, even older than that. So, the subject of
23    defiance towards authority and how that might be an issue
24    or a stressor in the community, as far as being stopped by
25    an officer, and what might happen if he was right and yet
```

57

1  held to his grounds, the officer—, things could go really
2  south. He acknowledged that, that was true. And he
3  actually understands the consequences of thinking that
4  could escalate behavior. So, that is a sign of growth and
5  maturity on his part since the last hearing, even with a
6  minor disciplinary since the last hearing. Um, I think we
7  wrote in hi—, his, he leaves update on parole plans. There
8  was valuable information about how his thinking has, has,
9  um, found a way to make a way in the community, that he
10  can connect with the community in a way that he wasn't
11  able to before, because of being able to get into
12  HealthRIGHT 360. Maybe, even though, he doesn't have a
13  letter, he knows where that organization is. And he's
14  written to them, the Timelist Group, the Amity Foundation.
15  A lot of times they already write letters. So, I'm not
16  sure if they're having some staffing, some problems too,
17  you know, due to COVID. Um, but you know, to his credit,
18  he is able to talk to the Parole Board in an empathetic
19  way now. He's now able to connect emotionally, which he
20  wasn't able to do before in his life. So, there's this
21  process where, you know, he's learning how to stop and
22  think, he can take a breath to deal with the anger issues,
23  and he's able to understand and not be un-empathetic
24  towards the position of other people around him. I'll
25  submit that.

1    **PRESIDING COMMISSIONER SHARRIEFF:**  Thank you, sir.

2    So, Mr. Robinson, as you're well aware of, sir, this is

3    your opportunity to provide the Panel with your closing

4    statement. If you have one written out and you want to

5    read that, that's perfectly fine. And once you're done

6    reading that statement, if you have anything on your heart

7    that you want to share as well, that's perfectly fine as

8    well. Okay, sir? The floor is now yours.

9    **INMATE ROBINSON:**    I don't have a closing statement.

10   I would like to say that I know what brought us here was

11   the fact that I killed Mr. Dishman. And I am absolutely

12   remorseful for that. The loss of life is in my mental and

13   spiritual growth and development on this <inaudible>

14   precious life is. You know, and I took something that I

15   can't never get back. I hurt him. I killed him and I hurt

16   everybody that he's connected to. I hurt my family, you

17   know? So I, I, I get it. Um, and I absolutely remorseful

18   for that. The insight into the crime, I, I have insight. I

19   understand my upbringing and what allowed me to devolve

20   into somebody who didn't care about others. I, I, I know

21   what caused all of this stuff. So, my ability to address

22   those issues, I have been doing that here. And absolutely,

23   I'm not a person. I, I get that. I'm being human being.

24   Yes, I make mistakes. I don't like to be called on my

25   mistakes, but I appreciate the fact that somebody will do

1   that, that, then you have to have some <inaudible> about

2   me that they know that I have the potential to be able to

3   get past all that. So, excuse me, I know I'm not

4   worthless. I know that I have work to do, and I'm willing

5   to do that. That's all I have.

6        **PRESIDING COMMISSIONER SHARRIEFF:**  Thank you, Mr.

7   Robinson. And Mr. Caves, as always, before we recess for

8   deliberation, do we have any victims impact statements

9   <inaudible> your record, sir?

10       **DEPUTY DISTRICT ATTORNEY CAVES:**   I do not. Thank

11  you.

12       **PRESIDING COMMISSIONER SHARRIEFF:**  Thank you. With

13  that being said, everyone, the time now is 2:26 PM. The

14  Panel will not recess for deliberation.

15

16                      **[RECESS]**

17

18

19

20

21

22

23

24

25

1                **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                          **DECISION**

3     **DEPUTY COMMISSIONER DENVIR:**   We're back on the

4  record.

5     **PRESIDING COMMISSIONER SHARRIEFF:**  Thank you,

6  Commissioner. We're back on the record. The time now is

7  2:44 PM. And today's date is October 7th, 2021. We will

8  now reconvene this hearing for pronouncement of the

9  Panel's decision. All parties present before the Panel's

10  deliberations have returned. According to the Panel's

11  information, and we do note that Mr. Robinson was received

12  from the County of Kern on May 10th, 1982, for the

13  controlling case of murder-second. The victim in this case

14  was Mr. Alfred Dishman. Last name is spelled D-I-S-H-M-A-

15  N. In the case before the Panel, we must make a

16  determination whether Mr. Robinson continues to pose an

17  unreasonable risk to public safety if released.

18  Accordingly, a denial of parole must be based upon

19  evidence in the record of Mr. Robinson's current

20  dangerousness. In this case, the Panel has already

21  considered Mr. Robinson's electronic central file, as well

22  as the most recent Comprehensive Risk Assessment, the

23  additional documents that were submitted to the Panel this

24  afternoon, the three-page documents, and also the written

25  **RONALD ROBINSON   C47067   10/07/2021   DECISION PAGE 1**

1   response received from the public, and statements provided

2   by uh, inmate Counsel, and the letter from Kern County as

3   well. The confidential portion of Mr. Robinson's central

4   file was reviewed. However, the Panel did not rely on any

5   information contained therein, due to lack of relevancy.

6   So, having these legal standards in mind, we find that Mr.

7   Robinson does pose an unreasonable risk to public safety,

8   and is therefore, not eligible for parole. So Mr.

9   Robinson, what the Panel did, we looked at all of the

10   relevant risk factors and we weighed them all. And in

11   doing so, what the Deputy Commissioner and I discovered is

12   that, the aggravating risk factors, they outweigh the

13   mitigating risk factors. Now, with that being said, they

14   were a laundry list of mitigating risk factors in your

15   case, meaning, some good factors in your case, Mr.

16   Robinson. Most notably, you are youth offender and also,

17   you also qualify as an elderly offender. With regards to

18   being a youth offender, this Panel did give great weight

19   to your youth offender factors. We did see some evidence

20   of diminished culpability of youth as compared to adults.

21   We saw this evidence in your negative environment where

22   you did receive some childhood trauma and that home life

23   that you described as well. We also note that you engage

24   in criminal behavior prior to the age of 26. We suggest to

25   **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 2**

1   this Panel that you had a diminished suscep—,

2   susceptibility to deterrence, as well. We also saw

3   evidence of the hallmark features of youth and your

4   recklessness, and your behavior as a youth suggest that

5   you did not appreciate the consequences of your actions in

6   terms of public safety. And again, we looked at your prior

7   criminal history that was indicating your central file as

8   well, but we have seen some growth and maturation in Mr.

9   Robinson since he's been in prison. And since he's aged,

10  as indicated, we do note that he is not engaged in any

11  recent gang involvement or negative peer influence. He has

12  not been involved in any drug use. Uh, but more

13  importantly, we do not see any recent old tort violence in

14  Mr. Robinson's file. And that goes to show that number

15  one, he's not the same person who committed this horrible

16  crime, nor is he the same person that was at his 2018

17  hearing. And this Panel member was a part of that 2018

18  hearing, and can attest that Mr. Robinson has changed.

19  He's not that same person. We see his evolution. However,

20  there's still some evidence and stuff that is <inaudible>

21  Mr. Robinson's progress. We're going to discuss

22  momentarily as well. As far as being an elderly offender,

23  we also gave special consideration to his elderly offender

24  status. We note his age of 61, his long-term confinement

25  **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 3**

1    in 1982, that he's been in prison since that time.

2    However, we do note that although Mr. Robinson is 61, he

3    is a young 61, and he does have the physical capability of

4    engaging in and <inaudible> violence at the age of 61. But

5    we do note that he has shown that growth and maturation

6    and we have not seen any recent violence in his file,

7    whatsoever. And so, we did give special consideration to

8    his growth in that area, as well. As far as programming

9    again, that was also a mitigating. We do note, um, as

10   indicated throughout the central file and also throughout

11   this hearing, Deputy Commissioner covered his post-

12   conviction factors. And it's clear that his programming is

13   mitigating. We do note that he asked me to engage in

14   college and numerous work assignments, as well as

15   addressing his criminogenic needs, including, but not

16   limited to the Alternatives to Violence Project in 2020.

17   And the reason why I'll be bringing that up is because

18   it's very important. In 2020, when he engaged in that

19   counseling chrono, that 128-A, it was clear to this Panel

20   that Mr. Robinson didn't engage, he did not engage in

21   violence. He took a moment to reflect. He took a moment to

22   stop and think and to breathe. He used those coping

23   skills, but more importantly, he thought about the

24   consequences and that's consequential thinking. And that's

25   **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 4**

1   what we expect with someone who's been engaged in that

2   type of programming that Mr. Robinson has been engaged in,

3   is to think about the consequences of his actions and not

4   engage in any type of violence, whatsoever. But the Panel

5   was also concerned with what happened prior to that. And

6   the anger that it <inaudible>. So, we want Mr. Robinson

7   also to be able to regulate his emotions inside the prison

8   walls, so that when he's faced with any novel stresses out

9   there in the community, he can also employ those skills

10  dealing with not only violence, but also anger in the

11  community, as well. His parole plans, they were not

12  aggravating nor were there um, mitigating. We saw them as

13  being neutral, no impact, because although he did submit a

14  three-page documents indicating his parole plans, we did

15  not see any letters of acceptance um, coming his way, but

16  we didn't give it so much because we do understand that

17  the Division of Adult Parole Operations, DAPO, can assist

18  Mr. Robinson in that area. But we do know at least it's

19  some footwork in that area, um, and to address his parole

20  plans. And so, we left that as non-mitigating, not

21  aggravating, just not impact, neutral. But we didn't use

22  that against Mr. Robinson because he did give some effort

23  in that area, as well. As far as the aggravating factors,

24  there were a few that were static, mainly his social

25  **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 5**

1  history. We do note that he had the inability to regulate

2  his emotions in particular, anger, greed, and selfishness.

3  Um, we also note that he had poor coping skills and fear,

4  stress, and some issues dealing with some authority

5  figures. His prior criminal history was clearly

6  aggravating as, that noted in his central file. And the

7  commitment offense, the death of Mr. Alfred Dishman was

8  clearly aggravating as well. Mr. Robinson's disciplinary

9  history, as indicated throughout this hearing, also

10  throughout his central file, the 46 rules violations, I

11  believe we saw, counted 14 for violence, 7 for weapons,

12  and 13 or defiance of authority. And that's a lot of RVR's

13  and it's a lot of RVR's for those, those issues, because

14  some of those similar issues with violence and fear and

15  anger, do you realize that with the, hey, at the time of

16  the life crime, it was a contributing factors um, to the

17  life crime as well? The Comprehensive Risk Assessment

18  wasn't favorable. It, it was authored, it was approved by

19  the Forensic Assessment Division on September 10th, 2021.

20  And the doctor indicated that Mr. Robinson is a moderate

21  risk for violence at this time, which we find supports our

22  decision. When we look to offender change, because I see

23  elephant in the room at these hearings is whether or not

24  Mr. Robinson has changed. And clearly, he has. He is not

25  **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 6**

1   the same person who committed this crime, and he's not the

2   same person in 2018. Again, we reiterate no recent

3   violence, no recent drug use, no reason gang involvement,

4   and no recent serious rules violations, which clearly

5   demonstrates to this Panel that Mr. Robinson's on that

6   positive trajectory and he should be in a position to

7   receive a grant of parole, um, fairly uh, soon. Now, with

8   that being said, Mr. Robinson's 46 RVR, rules violations,

9   does indicate violence, anger, and as well as defiance of

10  authority. That 2020, uh, counseling chrono, it does

11  conti—, uh, demonstrate that continue lack of coping

12  skills, dealing with stress, anger, and authority, the

13  life crime, the causative factors, at least two causative

14  factors, including anger and fear as well. In addition, we

15  saw an insufficient programming addressing his underlying

16  risk factors. Although he has been involved in a lot of

17  programming, he needs more in the area of regulating his

18  emotions and coping skills, dealing with anger because

19  that's Mr. Robinson's Achilles heel. It's his, his, his

20  inability to regulate his emotions. So, there's nothing

21  wrong with anger, right? But you want to be slow to anger.

22  And then, when you, when you become angry, you want to be

23  able to deal with that anger as well. We also saw some

24  issues with what we call is Impression Management. And we

25  **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 7**

1   want Mr. Robinson to be more transparent with the next

2   Panel. Meaning, show all your blemishes, show all your

3   character defects, put everything on the table. Don't be

4   afraid to be imperfect. We're all imperfect. But when you

5   hide the ball so to speak, or you try to be evasive, it

6   shows that criminal thinking, which also played a role in

7   the life crime and also your rules violations, not to

8   mention the counseling chrono in 2020. That was criminal

9   thinking. Right? And so, we want you to be able to deal

10   with situations even when you know in your heart, hearts

11   you're in the right. It's not about right or wrong. It's

12   about assessing the situation and making sure you

13   deescalate any situation that could go out of hand. With

14   regards to that 2020 counseling chrono, we understand

15   COVID. We understand your concern with catching that, that

16   horrible virus. We totally get it. All we want to know is

17   Mr. Robinson, was there any other way you could have

18   handled that situation a little bit better? And not have a

19   115 that was reduced down to a counseling chrono? Is there

20   any way that this matter, if it could have not even

21   existed at all? And if so, that's the route we want you to

22   take, because if you would have taken that route and to

23   this hearing Panel, perhaps this, this outcome would have

24   been a little bit different and perhaps, if you would have

25   **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 8**

1  engaged in a little bit more programming, addressing how

2  to regulate your emotions, perhaps, the outcome of this

3  hearing could have been a little bit better as well. And

4  so, with those two areas, Mr. Robinson, regarding the

5  anger and controlling your anger as far as regulating that

6  emotion, that's very important. That's very important,

7  sir. And so, because we do not want you to come back, even

8  on a parole violation. We want to release you back into

9  co—, in the community. We want you to be that I deal

10 citizen. Deputy Commissioner, anything further, sir?

11  **DEPUTY COMMISSIONER DENVIR:**   I had just a couple

12 things, Mr. Robinson. Uh, but firstly, uh, uh, from what

13 you undoubtedly already know that the Commissioner is the

14 chair of the Panel. He speaks for both of us and I fully

15 concur with everything that he has said. Uh, just in terms

16 of, uh, moving forward, sir, um, we talked about how that,

17 uh, the Daring Way Program, which is a mental health, uh,

18 program, program, it's under the auspices of the mental

19 health program, uh, where you, you kind of drill down. Um,

20 again, this was from July of '19 until the pandemic shut

21 this down. But you were working on with the mental health

22 clinicians in a group setting. I note the roots of the

23 shame that you had from childhood and better understanding

24 that, better processing that, better healing that, uh, you

25 **RONALD ROBINSON   C47067   10/07/2021   DECISION PAGE 9**

1  know, that might be some--, worth something to go back to,

2  to maybe complete that work and maybe come back with the

3  additional issue either in a group or, or, um, one-on-one

4  with a clinician in this, in uh, that type of setting

5  where you—, instead, look at, you know, this pattern of

6  defiance of authority that has plagued you at least for

7  around the last 15 years, and, and focusing in on the

8  keywords of, you know, your perception that they're, you

9  know, in some way being unfair to you or and you know, it

10 may be that something that can be drawn out and parse

11 through a bit and, and work through, uh, to help better,

12 you know, give you the tools and skills to, to manage that

13 and different ways to look at it. Um, you know, just, uh,

14 uh, that's a suggestion moving forward because the, I

15 thought the Commissioner, in very practical terms, gave

16 you an issue where this could come up in the community,

17 with you being stopped for something maybe that was not,

18 in keeping with what should have been done. And you may be

19 reacting in a way that causes a situation that could be

20 handled well, with the right emotional control on your

21 part, and could spiral into a really ugly situation, where

22 if you're in check and, you know, have that peace inside

23 of you where this is going on, but you have that peace,

24 you can get through this in a, in a good way and get to

25 **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 10**

1  the other side of it, you know, and then that's a

2  situation that can be handled well. So, um, I think that,

3  that, that's just what I wanted to offer to you and

4  suggestions. I, you know, again, I'll just reiterate from

5  what the Commissioner has already said. Really, positive

6  things you're doing in the area of college. You got this

7  both going, you know, um, you know, behaviorally, this is

8  kind of the remnants of, of a history of working through

9  these behavioral issues. But you know, this is where you

10  are, but you know, it was, we see the progress obviously,

11  uh, over the years. And, uh, I, I commend you for what

12  progress you've made, sir. So, with that, I'll defer back

13  to the chair.

14      **PRESIDING COMMISSIONER SHARRIEFF:**  Thank you, Deputy

15  Commissioner. I concur with your, your statements as well.

16  So, Mr. Robinson, in terms of the denial length, we find

17  that there's clear and convincing evidence that neither a

18  10 or 15-year denial is appropriate. That's the

19  consideration of the victim of this case, as well as

20  public safety. We looked at a seven-year denial and

21  clearly, we did not see any recent overt violence in your

22  file. And so, we looked at a five-year denial and we saw

23  that since 2018, you have been engaging in some

24  programming. You have not received any additional serious

25  **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 11**

```
 1   rules violations. And we also see that you're constantly
 2   growing in a positive manner. And so, if, if this was the
 3   old days, Mr. Robinson, and we could deny you for one
 4   year, we would do so, sir. But when <inaudible>, the
 5   minimum denial length is three years. And so, the minimum
 6   amount that we could deny you is three years. So, it's
 7   going to be a three-year denial. However, we encourage you
 8   not to wait the entire three years. Your risk assessment
 9   is, is moderate. And so, with that being said, if you can
10   continue on a positive trajectory by not engaging in any
11   serious rules violations, and also programming in a
12   positive manner, even in, no counseling chronos as well,
13   perhaps, the Board will advance your case, or you can do
14   what's called a petition to advance your case. You will
15   receive a 1045-A Form from your Counselor and come back
16   before three years, because we want to see you before
17   three years, Mr. Robinson. We're trying to do everything
18   we possibly can to either tools, even the information,
19   everything you need to go home. You've been in prison
20   since 1982. It's been a long haul for you. 46 rules
21   violations, but since 2018, that last hearing, again,
22   clearly, you turn the corner and you're not the same
23   person. So, what we tell inmates, and I know it sounds,
24   you know, just help us help, help us help you. Come back
25   RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 12
```

1  into this hearing process. Minimize your, your, your

2  issues, right? No more run-ins and interactions in a

3  negative manner. Control your anger, right? Eat, eat

4  humble pie, right? So, that's how life is sometimes. Even

5  when you're in the right, you just have to zip that mouth

6  up and, and cope, right? Life is very difficult. Whether

7  you're poor, whether you're rich, no matter what ratio,

8  life is difficult. But if it becomes more difficult, we

9  don't have any tools. Can you imagine, if you'd imagine,

10  the Deputy Commissioner driving late at night without his

11  glasses on a rainy road, can you imagine what can happen?

12  So, you know what he does? He picks his glasses up. He

13  puts them on his face. He can see better, right? That's a

14  tool that he uses. Same thing with you, Mr. Robinson.

15  These programs, they're tools. So that when something

16  happens, before you react, you pick up what you learned

17  from that program. You put it into your heart. Nothing

18  happens. Okay? Smooth driving, smooth sailing, so to

19  speak. We say all this, Mr. Robinson, because we're trying

20  to encourage you, sir, to stop the madness. We don't want

21  to see a 12th subsequent hearing. We don't want to see

22  that. We don't want to see you in a, in a wheelchair

23  rolling here. And you don't want to see that, sir. And

24  your behavior recent years indicate that you're not the

25  **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 13**

73

1  same person. So, let's cross that threshold, right? Let's,

2  let's continue in a positive manner. If, if you need this,

3  <inaudible>, go deep, right? Talk to <inaudible> to get

4  deep into this. Why am I still dealing with anger at 61

5  years of age? You might help me, right? Reach out for

6  help. And trust me, there are so many people in this world

7  that's all we want to do is help. That's all we want to do

8  is help, because we receive help and it helps us. And know

9  the power of help. Right? And so, we're trying to help you

10  down. And this is not enough. Go get it from somebody else

11  and someone else. And just, all you want to do is be a

12  help <inaudible>. Everyone helped me. Okay, Mr. Robinson?

13      **INMATE ROBINSON:**     Yes.

14      **PRESIDING COMMISSIONER SHARRIEFF:**   Okay. So, with

15  that being said, a three-year denial or you can come back

16  in, in a sooner time with a PTA or an AR from the Board.

17  In the meantime, no future rules violations, even

18  counseling chronos, no—, we want you to earn a positive

19  chronos as well. Improve on your parole plans and make

20  sure you get those letters in. Okay? And make sure you get

21  the letters in, and you keep the original. Give the uh,

22  copy to your Correctional Counselor and, or your Attorney.

23  We also want you to make sure that your parole plans are

24  recent as well. Deputy Commissioner, anything further,

25  **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 14**

1   sir?

2      **DEPUTY COMMISSIONER DENVIR:**   No, sir. I think it's

3   been covered. Thank you.

4      **PRESIDING COMMISSIONER SHARRIEFF:**   All right. Last

5   thing, Mr. Robinson, this decision is not final. It will

6   be reviewed by the Board for up to 120 days, and you will

7   be notified in writing if there are any changes to today's

8   decision. I want to thank everyone for your patience and

9   Deputy District Attorney, Mr. Caves, thank you also, sir,

10  for coming in a little early for us. We really appreciate

11  it. The time now is 3:02 PM. This hearing is now

12  adjourned. Good luck to you, sir.

13     **DEPUTY COMMISSIONER DENVIR:**   We're off the record.

14     **INMATE ROBINSON:**   Thank you, sir.

15

16

17

18

19

20

21

22

23

24

25  RONALD ROBINSON   C47067   10/07/2021   DECISION PAGE 15

1                          ADJOURNMENT

2    THIS TRANSCRIPT CONTAINS THE PROPOSED DECISION OF THE

3    BOARD OF PAROLE HEARINGS (BOARD) ANNOUNCED AT YOUR RECENT

4    BOARD HEARING AND IS PROVIDED TO YOU IN COMPLIANCE WITH

5    PENAL CODE SECTION 3041.5, SUBDIVISION (A)(4), AND

6    CALIFORNIA CODE OF REGULATIONS, TITLE 15, SECTION 2254.

7    THIS PROPOSED DECISION WILL BECOME FINAL WITHIN 120 DAYS

8    OF THE DATE OF THE HEARING AS REQUIRED BY PENAL CODE

9    SECTION 3041, SUBDIVISION (B), UNLESS THE BOARD NOTIFIES

10   YOU IN WRITING BEFORE THEN THAT THE PROPOSED DECISION HAS

11   BEEN MODIFIED, VACATED OR REFERRED TO THE FULL BOARD,

12   SITTING EN BANC, DUE TO AN ERROR OF LAW, ERROR OF FACT OR

13   NEW INFORMATION PURSUANT TO CALIFORNIA CODE OF

14   REGULATIONS, TITLE 15, SECTION 2042. THEREAFTER, THE

15   GOVERNOR HAS AUTHORITY TO REVIEW THE BOARD'S DECISION AND

16   AFFIRM, MODIFY, OR REVERSE IT PURSUANT TO PENAL CODE

17   SECTIONS 3041.1 AND 3041.2.

18

19

20

21

22

23

24

25   **RONALD ROBINSON    C47067    10/07/2021    DECISION PAGE 16**

### CERTIFICATE AND DECLARATION OF TRANSCRIBER

I, Arnel Mendoza, am a disinterested party, and have no interest in the outcome of the hearing. Further, I certify this transcript is a true, complete, and accurate record, to the best of my ability, of the recorded material provided for transcription of proceeding for:

In the matter of the Parole    CDC Number: **C47067**
Consideration Hearing of:

RONALD EUGENE ROBINSON

CALIFORNIA MEN'S COLONY

SAN LUIS OBISPO, CALIFORNIA

10/07/2021

1:03 PM

Signed: *Arnel Mendoza*

Transcribed by: Arnel Mendoza

Conduit Transcriptions

Copyright 2021 / All Rights Reserved by BPH

EXHIBIT B:

INMATE APPEAL LOG NUMBER 122857



CALIFORNIA DEPARTMENT *of*
Corrections and Rehabilitation

# CLAIMANT APPEAL CLAIMS DECISION RESPONSE

**Re:**  Appeal Claims Decision Response

| | |
|---|---|
| **Offender Name:**  ROBINSON, RONALD EUGENE | **Date:**  09/29/2021 |
| **CDC#:**  C47067 | |
| **Current Location:**  CMC-Facility C | **Current Area/Bed:**  C  006 2 - 211001U |

**Log #:**  000000122857

---

**Claim #  001**

**Institution/Parole Region of Origin:** California Men's Colony          **Facility/Parole District of Origin:** CMC-Central Service

**Housing Area/Parole Unit of Origin:**

**Category:**  Offender Resources                    **Sub-Category:**    Mail

The California Department of Corrections and Rehabilitation (CDCR) Office of Appeals received this claim on 07/30/2021.

California Code of Regulations, title 15, provides the Office of Appeals 60 calendar days to complete a response. Due to the expiration of time, this response by the Office of Appeals will be the only response.

You do not need to resubmit this claim to the Office of Grievances or to the CDCR Office of Appeals.

**Decision: Time Expired**

EXHIBIT C:

BPH NOTICE OF ATTORNEY REPRESENTATION FOR SUITABILITY HEARING

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                     GAVIN NEWSOM, GOVERNOR

BOARD OF PAROLE HEARINGS
P.O. BOX 4036
SACRAMENTO, CA 95812-4036

04/30/2021

RONALD,EUGENE ROBINSON
C47067
California Men's Colony

RE: ATTORNEY REPRESENTATION FOR PAROLE SUITABILITY HEARING

| | |
|---|---|
| **ATTORNEY:** | PATRICK SPARKS |
| **ATTORNEY ADDRESS:** | 2649 ORVILLE AVENUE , CAYUCOS, CA 93430 |
| **RETAINED BY:** | STATE |
| **DATE OF HEARING:** | 10/07/2021 |
| **TIME OF HEARING:** | 01:30 |
| **HEARING LOCATION:** | HIGHWAY 1, SAN LUIS OBISPO, CA 93409 |

The above named attorney is representing you at your parole suitability hearing.  You should anticipate a representative from the district attorney's office will participate in the hearing, either by sending a representative to the institution, via video or audio conference.  In addition, participation by the victim(s) or their representatives may also occur by personal appearance, via video or audio conference.

If you have any questions regarding this matter, please contact the Board of Parole Hearings at:

> Board of Parole Hearings
> P.O. Box 4036
> Sacramento, CA  95812
> Attn:  Program Operations/Scheduling Unit

EXHIBIT D:

DEPARTMENT OF GENERAL SERVICES CLAIM NOTICE

 CALIFORNIA DEPARTMENT OF
**GENERAL SERVICES**                    Governor Gavin Newsom

04/13/2021

Ronald G. Robinson C47067
California Men's Colony East
Highway 1, P.O. Box 8
San Luis Obispo, CA 93409

RE:  Claim 20011040 for Ronald G. Robinson C47067 against Department of
Corrections and Rehabilitation (CDCR)

Dear Ronald Robinson,

Government Claims Program (GCP) staff completed its investigation of your claim
and rejected it for the following reasons.

The claim involves complex issues that are beyond the scope of analysis and legal
interpretation typically undertaken by the GCP.  Claims involving complex issues are
best determined by the courts.  Therefore, staff did not make a determination
regarding the merit of the claim, and it is being rejected so you can initiate court
action if you choose to pursue this matter further.

If you choose to pursue court action in this matter, it is not necessary or proper to
include the GCP in your lawsuit unless the GCP was identified as a defendant in your
original claim.  Please consult Government Code section 955.4 regarding proper
service of the summons.

If you have questions about this matter, please feel free to contact GCP by phone,
mail, or email using the contact information below.   Please remember to reference
the assigned claim number (20011040) in your communication.

Sincerely,

Ulaa Alshami, Staff Services Analyst
Government Claims Program
gcinfo@dgs.ca.gov

**WARNING:**  Subject to certain exceptions, you have only six (6) months from the
date this notice was personally delivered or deposited in the mail to file a court action
on this claim.  See Government Code Section 945.6.  You may seek the advice of an
attorney of your choice in connection with this matter.  If you desire to consult an
attorney, you should do so immediately.

 CALIFORNIA DEPARTMENT OF GENERAL SERVICES

Governor Gavin Newsom

## DECLARATION OF SERVICE BY U.S. MAIL

Name of Claimant: Ronald G. Robinson C47067
GCP File no.: 20011040

I am employed by the Government Claims Program. I am 18 years of age or older. I am familiar with the business practice at the Government Claims Program for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Government Claims Program is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business. On 04/13/2021, I served the attached letter by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Government Claims Program, located at 707 Third Street, West Sacramento, CA 95605, addressed as follows:

Ronald G. Robinson C47067
California Men's Colony East
Highway 1, P.O. Box 8
San Luis Obispo, CA 93409

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on 04/13/2021, at West Sacramento, California.

_____
Ulaa Alshami